No. 12990

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

STATE OF MONTANA,

    Plaintiff and Respondent,

    -vs-

ANDRA PHILLIP STEWART,

    Defendant and Appellant.

Appeal from:  District Court of the Eighth Judicial District,
              Hon. Robert S. Keller, Judge presiding.

Counsel of Record:

    For Appellant:

        Moses, Kampfe, Tolliver and Wright, Billings,
          Montana
        Charles F. Moses argued, Billings, Montana

    For Respondent:

        Hon. Michael Greely, Attorney General, argued,
          Helena, Montana
        J. Fred Bourdeau, County Attorney, argued,
          Great Falls, Montana

                              Submitted:  January 24, 1977

                              Decided:DEC 14 1977

Filed: DEC 14 1977

*Thomas J. Kearney*
                                          Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Defendant Andra Phillip Stewart appeals from a conviction of aggravated kidnapping under section 94-5-303, R.C.M. 1947, following trial in the District Court, Cascade County.

In early January, 1974, defendant, an airman stationed at Malmstrom Air Force Base near Great Falls, Montana, was involved in a court-martial hearing at that installation. On January 9, after spending the afternoon at Malmstrom's legal office, defendant met Larry Vample, also an airman at the Base, and the two men went to the Base recreation center. They stayed there for a few minutes, then drove in Vample's car to the apartment of Billy Naray Evans in Great Falls. Vample later left Evans' apartment in his car, and defendant and Evans drove to Darrell Sloan's apartment, where they met Vample, Sloan, and three other airmen.

The men discussed defendant's court-martial. Defendant told them someone had informed on him and others living off the Base in Great Falls. John K. Walsh, Jr., an airman who lived in defendant's barracks, was mentioned as a possible informant. They agreed to confront Walsh and to force him to tell them whether he had informed, and if he had, what he had said. Before leaving for the Base, Evans obtained a syringe from one of the other airmen and filled it with battery acid, with the apparent intention of using this device to threaten Walsh.

They arrived at Malmstrom sometime between 9:00 and 9:30 p.m. While the others waited in his barracks room, defendant went to get Walsh. Defendant returned with Walsh, and asked him if he had been an informant. Walsh denied he had informed on anyone, and bolted for the door. He was stopped, a scuffle ensued, and Walsh was knocked to the floor and grabbed by several people. Evans then tried to inject the battery acid into Walsh's leg, but the needle broke and the attempt was unsuccessful.

One of the men threatened Walsh with a gun, telling him to be quiet. Walsh finally was subdued. By this time, the only persons left in defendant's room were Evans, Vample, Walsh, and defendant. His mouth taped and his body wrapped in a blanket, Walsh was carried out of the barracks, placed in Vample's automobile, and taken to the Giant Springs recreation area near Great Falls. There Walsh was removed from the vehicle and shot--once in the chest and three times in the head. His body was thrown over the bank of the Missouri River, where it was found three days later by a fisherman.

There was a direct conflict in testimony at the trial concerning who was present and who did the shooting when John Walsh, Jr. was killed. Evans and Vample testified they, together with defendant, took Walsh to Giant Springs and defendant shot and killed Walsh. Defendant testified he abandoned the enterprise as Walsh was being taken from the barracks by Evans and Vample, and he was not present when Walsh was shot.

Defendant subsequently was arrested and charged by Information, filed in the District Court, Cascade County, on three felony counts: one court of deliberate homicide, in violation of section 94-5-102, R.C.M. 1947, and two counts of aggravated kidnapping, in violation of section 94-5-303, R.C.M. 1947.

Defendant plead not guilty to each of the counts of the Information. Trial by jury began on September 9, 1974. At the conclusion of the state's case, the trial court granted defendant's motion to dismiss the third count, which alleged defendant kidnapped Walsh for the purpose of interfering with a governmental investigation. On September 19, 1974, defendant was found not guilty of the deliberate homicide count, and guilty of the remaining count of aggravated kidnapping. Defendant appeals from the conviction and from the 100 year sentence imposed thereon.

Defendant presents twelve issues for review:

1. Whether the District Court had jurisdiction over this kidnapping offense which occurred on a United States Air Force Base.

2. Whether defendant's motion for a change of venue should have been granted.

3. Whether Air Force personnel and Blacks were spectacularly and purposely excluded from the assessment roll which made up the jury panel list.

4. Whether testimony and evidence obtained by the use of a dog is admissible.

5. Whether the District Court erred when it refused defendant the right to cross-examine a prosecution witness as to his military rank.

6. Whether the District Court erred when it refused to allow testimony as to items seized under a search warrant.

7. Whether a prosecution witness was erroneously permitted to testify as to a self-serving and hearsay statement.

8. Whether a prosecution witness was erroneously permitted to testify as to his conclusion.

9. Whether the District Court erroneously answered a jury question after the case was submitted to the jury.

10. Whether the kidnapping punishment statute which requires the sentencing judge to make a finding of fact and base his sentence thereon is unconstitutional.

11. Whether the 100 year sentence was error.

12. Whether the District Court improperly retried the case by personally interviewing witnesses after the jury verdict and then making determinations of fact as a part of the sentencing procedure.

Issue 1. Defendant contends the District Court was without jurisdiction over the kidnapping offense because the crime took

-4-

place on a United States Air Force Base. In State ex rel. Parker v. District Court, 147 Mont. 151, 155, 410 P.2d 459 (1966), this Court held that where the federal government purchases land from the state, the state reserves criminal jurisdiction over such land after its purchase. Defendant recognizes Parker, but contends 1) it is erroneous, and 2) it is no longer controlling as the law has since been changed and the state now has no such jurisdiction.

We affirm our holding in Parker. The state may reserve criminal jurisdiction over land conveyed to the federal government. State v. Rindal, 146 Mont. 64, 67, 404 P.2d 327 (1965).

The next question of Issue 1 is whether section 95-304, R.C.M. 1947, the general statute for criminal jurisdiction, enacted after Parker, divests the state of jurisdiction over a crime committed on a federal military base located in Montana. In relevant part, section 95-304 provides:

> "(a) A person is subject to prosecution in this state for an offense which he commits * * * if:
>
> "(1) The offense is committed either wholly or partly within the state * * *
>
> " * * *
>
> "(d) This state includes the land and water and the air space above such land and water with respect to which the state has legislative jurisdiction."

Defendant argues that since Montana first must have legislative jurisdiction over the Air Force Base before it can claim criminal jurisdiction, under section 95-304, the state may not try the kidnapping in the present case. We do not think this statute can be so narrowly interpreted.

The Revised Commission Comment concerning section 95-304 states:

> "The purpose of this section is to establish a broad grant of jurisdiction for all crimes.
>
> " * * *
>
> "Subsection (d) claims for the state of Montana the maximum territorial jurisdiction compatible with federal claims."

There is nothing in the language of section 95-304 indicating legis-
lative intent to restrict jurisdiction this state had previously
exercised over crimes committed on land purchased by the federal
government. We hold the District Court did have jurisdiction.

Issue 2. Defendant contends the trial court should have
granted his motion for change of venue because of the anti-Black
attitude alleged to exist in Great Falls, the trial site. Defendant
and the other airmen involved in the incident are Blacks. The vic-
tim was Caucasian.

Defendant did not move for change of venue until the eve
of trial. One witness called in support at the hearing on defend-
ant's motion was Air Force Captain Theron R. Jones, Chief of Social
Activities at Malmstrom. The main thrust of his testimony was that
there is, in his opinion, a kind of "unconscious bias" against
Blacks in Great Falls. He explained that by "unconscious bias",
he meant the local population would tend to judge a Black person to
be a troublemaker. A Black himself, Capt. Jones conceded he had
not had any problems personally, but indicated other Blacks experi-
enced this "unconscious bias".

During the hearing, this exchange took place:

"THE COURT: Do you think going out of this county
would change unconscious bias?

"THE WITNESS: [Jones] Not in the State of Montana, no.

" * * *

"MR. WRIGHT: [counsel for defendant] Your Honor, I
personally think * * * I asked the Captain if he
thought Airman Stewart would get a fair trial here,
and I believe your answer was * * *

"THE WITNESS: My answer is no.

"THE COURT: By the same token, you don't think he
would get any fairer a trial anywhere else in the
State as far as you know?

"THE WITNESS: As far as I know."

Captain Jones stated this "unconscious bias" probably existed throughout the state of Montana and that it also existed in other states where he had been stationed. The only other evidence on this point was presented by the same witness, who testified to some vague problems created in the community by Black Air Force personnel dating local white, Indian, and Chicana girls.

A clear abuse by the District Judge in denying a change of venue is required to support reversal of his denial. State v. Logan, 156 Mont. 48, 58, 473 P.2d 833 (1970). Neither in the original hearing on this motion nor on appeal has defendant shown he could not receive a fair trial in Cascade County. There is simply no evidentiary basis in the record to show the trial court abused its discretion in denying a change in venue.

Issue 3. Defendant contends he was denied a fair trial because Air Force personnel and Blacks were excluded from the assessment roll which made up the jury panel list. There is no dispute that no Black Air Force personnel were included in the jury panel list.

A fair cross section of the community must be represented on such a panel to fulfill the Sixth Amendment's guaranty of an impartial jury trial in criminal prosecutions. While a defendant is not entitled to a jury of any particular composition, the jury panel "must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L ed 2d 690, 703 (1975).

The jury panel in the instant case came from the Cascade County assessor's list of qualified taxpayers, a method of selection that is not per se unconstitutional. Leggroan v. Smith, 498 F.2d 168, 170 (10th Cir. 1974). Defendant argues this method is unconstitutional here because its use results in the exclusion of a sub-

-7-

stantial percentage of the Air Force personnel at Malmstrom from the county's jury panel.

The record discloses Air Force personnel constitute approximately 15 percent of the population of Cascade County, and that approximately 10 percent of all Air Force personnel at Malmstrom are Black. The assessor's list of taxpayers, however, includes only about 20 percent of the Air Force personnel who live in the county. The questions is--Does this variation between the percentage of Air Force personnel in the county and the percentage of their representation on the jury panel, as taken from the assessment roll, reflect a constitutional infirmity in the selection method.

We hold that it does not. Under the Soldiers' and Sailors' Relief Act, 50 U.S.C. §574, enacted in 1940, military personnel may not be required to pay taxes in the state in which they are stationed if they retain residence elsewhere. Cascade County allows Air Force personnel to exempt themselves from this taxation by the signing of an affidavit stating that the affiant is a nonresident. The effect of this voluntary exemption is to keep those who so elect off of the assessment roll, and consequently, off of the county's jury panel list.

Here, at the time of trial, state law required that a juror be a resident of this state for one year. Section 93-1301, R.C.M. 1947 (repealed 1975). One year residency requirements for jurors have been upheld as constitutional. United States v. Ross, 468 F.2d 1213, 1216 (9th Cir. 1972), cert. denied 410 U.S. 989, 93 S.Ct. 1500, 36 L ed 2d 188; United States v. Perry, 480 F.2d 147, 148 (5th Cir. 1973).

By signing the affidavit of nonresidency required for exemption from taxation, military personnel established exemption from jury duty in the state. The latter effect was incidental; the purpose of the exemption affidavit was to facilitate compliance

-8-

with federal law respecting the status of military personnel as taxpayers in the state where they are stationed.

Nonresidency is sufficient grounds for the exclusion from the jury panel list of the majority of Air Force personnel living in Cascade County on temporary assignment, and defendant's conviction therefore is not invalid.

Since over 95 percent of the Black population of Cascade County is Air Force personnel, it follows that, if most of them choose to take the exemption from taxation, only a small percentage of the jury panel list will be Blacks. The number of Black Air Force personnel remaining for inclusion in the jury panel equals approximately .35 percent of the county's total population. All Blacks in Cascade County constitute approximately 1.65 percent of the county's population; the variation between the percentage of Blacks in the county and those qualified to be on the jury panel list thus is about 1.4 percent. Defendant cites no authority to the effect that such a small variation shows systematic exclusion of a distinctive community group.

Issue 4. Defendant contends the trial court improperly allowed testimony as to evidence obtained through the use of dogs during the search of the Giant Springs area. Keith Wolverton, a Cascade County deputy sheriff, and other sheriff's department personnel brought several dogs to the area after the victim's body was discovered there. The dogs located a pool of blood in the snow, and after examination the sheriff's deputies recovered two bullets in or near the blood.

Defendant argues that under State v. Storm, 125 Mont. 346, 238 P.2d 1161 (1951), testimony given by Deputy Wolverton relating to the recovery of this evidence should not have been permitted. In Storm, bloodhounds allegedly followed a scent from a foot or knee-print found near the site of a fatal shooting which ultimately led

them to the defendant's house. The handler testified that his dogs' behavior would tend to incriminate the defendant. The purpose of the testimony was to link the defendant to the crime, and it was the only evidence.

Storm is clearly distinguishable from the present case. Here, dogs were not used to track and locate the defendant, and the testimony allowed did not tend to identify defendant as having been in the area searched with the aid of the dogs. The testimony objected to here was not that of a dog or other dumb animal as interpreted by his handler. It was that of an investigating officer, whose tools included specially trained dogs. Defendant was afforded ample opportunity on cross-examination to question the relevance of the evidence recovered with the aid of the dogs, and Deputy Wolverton's testimony concerning this recovery is not "bloodhound testimony" found to be incompetent in Storm. The testimony was properly allowed.

Issue 5. Defendant contends the trial court erred in refusing his inquiry as to the military rank of a prosecution witness, Robert Lusk, Jr. Lusk, a special agent of the Air Force Office of Special Investigations, testified on direct examination that the victim, Walsh, had provided him with information concerning criminal investigations Lusk's office was carrying out at Malmstrom. In his testimony, Lusk identified the victim's body in a photograph as Walsh.

In his voir dire of the witness, defense counsel asked Lusk what his military rank was. Lusk replied that his rank was privileged. During the in-chambers discussion that followed, defense counsel contended the question as to Lusk's rank was related to the second count of aggravated kidnapping, the charge involving defendant's alleged interference with the performance of a governmental investigation.

In chambers, the witness stated that nondisclosure of his military rank was necessary to insure cooperation from military personnel being investigated. It was the Air Force's belief that personnel of a lower rank than the investigator would be intimidated, and that personnel of a higher rank might intimidate a lower ranking investigator. The trial court ruled Lusk's rank was irrelevant, and since the purpose of Lusk's direct testimony was to identify the victim, inquiry into the witness' rank exceeded the scope of direct examination.

Defendant has shown no prejudice as a result of the trial court's ruling. Whatever inquiries defendant may have made concerning the third count were rendered moot by the trial court's granting of defendant's motion to dismiss that count at the close of the state's case.

Issue 6. Defendant contends the trial court improperly refused to allow testimony as to items seized under a search warrant. Cascade County Deputy Sheriff William Fargo testified on direct examination that he searched defendant's barracks room and recovered a note and some masking tape. On cross-examination, he stated a rug and sheets from defendant's bed were also recovered, and that the other officer present seized other items. Deputy Fargo also testified a complete inventory of all items seized was filed as a return on the search warrant with the issuing court.

When defense counsel asked how many items were taken, the state objected on the grounds the best evidence would be the search warrant and return thereon, and the trial court sustained the objection. Defendant has not shown how he was prejudiced by this ruling, and the fact the witness testified on recross-examination as to the other items seized eliminates any possibility of prejudicial error.

Issue 7. Defendant contends a prosecution witness was improperly allowed to make a self-serving and hearsay statement.

The witness, Air Force Captain Robert Stewart, was brought to Malmstrom to try defendant's court-martial. On cross-examination, defense counsel asked the witness if he had made formal application to call John Walsh, Jr., as a witness in the court martial proceedings. Captain Stewart testified he had made no such application, and the Air Force Office of Special Investigations had refused to officially release Walsh's name. On redirect examination, the witness was asked if he had attempted or had been precluded from making formal application for Walsh as a witness. This question triggered defendant's objection, and the trial court's overruling of the objection, here specified as error. The witness' answer, that he had been precluded from calling Walsh in the sense that the Office of Special Investigations would not release Walsh's name, was not prejudicial to the defense. There was no error in allowing the question.

Issue 8. Defendant contends the trial court should not have permitted a prosecution witness to testify that he knew of no reason why Billy Naray Evans would shoot John Walsh, Jr. Defendant argues the question called for a conclusion and therefore, the trial court should have sustained his objection to the question.

Defendant has shown no prejudice from this question or its answer with respect to the kidnapping charge. The question went to the prosecution's attempt to prove defendant guilty of the deliberate homicide charge, of which he was found innocent. There was no prejudicial error in permitting the witness to reply to the question.

Issue 9. Defendant contends the trial court erroneously answered a jury request after the matter was submitted to the jury. The record discloses this was submitted, in writing, to the trial court:

-12-

> "There have been two charges of kidnapping.
> They dropped one charge. Could you specify the
> charge and boundary of the charge that was dropped?
> We the jury feel that one charge that was dropped
> is the one inside. The other we feel is the one
> with the car to Giant Springs."

Defendant and his counsel were given the opportunity to read the request. Defendant argued the only proper response would be to supply the jury with a copy of the dismissed third count.

Over defendant's objection, the trial court gave the jury a written answer which stated that the Information alleged two counts of aggravated kidnapping; set forth both counts verbatim from the Information; and, concluded by stating that Count III had been dismissed.

Defendant contends the answer, as given, placed undue emphasis on the remaining kidnapping count and therefore improperly indicated to the jury how it should view the evidence. This contention is without merit.

The original instructions did not set out the Information under which defendant was charged. The instructions did state defendant was charged with deliberate homicide and aggravated kidnapping, and indicated what those charges entailed. The response to the jury's request given by the trial court was no more than an additional, warranted instruction as to the law applicable to the case.

Under section 95-1913(d), R.C.M. 1947, a trial court may give additional instructions after the case has been submitted to the jury. In State v. Hawkins, 165 Mont. 456, 460, 529 P.2d 1377 (1975), this Court held it is in the discretion of the trial court whether or not to give additional instructions when such a request is made. There was no abuse of discretion in the present case.

Issue 10. Defendant challenges the constitutionality of section 94-5-303(2), R.C.M. 1947, the aggravated kidnapping punishment statute. This sub-section, before amendment in 1977, provided:

"(2) A person convicted of the offense of aggravated kidnapping shall be punished by death as provided in section 94-5-304, or be imprisoned in the state prison for any term not to exceed one hundred (100) years unless he has voluntarily released the victim, alive, in a safe place, and not suffering from serious bodily injury, in which event he shall be imprisoned in the state prison for any term not to exceed ten (10) years."

Defendant asserts this statute is unconstitutional because it requires the trial court to make a finding of fact, thereby violating defendant's right to have all facts submitted to and determined by the jury.

The existence of every fact necessary to constitute the crime charged must be proved beyond a reasonable doubt. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L ed 2d 368, 375 (1970). Initially, the question is whether an accused's voluntary release of or failure to release his victim in a safe place, alive and not suffering from serious bodily injury, has any bearing on his guilt or innocence of the crime of aggravated kidnapping.

Clearly it does not. Section 94-5-303(1), R.C.M. 1947, provides:

"(1) A person commits the offense of aggravated kidnapping if he knowingly or purposely and without lawful authority restrains another person by either secreting or holding him in a place of isolation, or by using or threatening to use physical force, with any of the following purposes:

"(a) to hold for ransom or reward, or as a shield or hostage; or

"(b) to facilitate commission of any felony or flight thereafter; or

"(c) to inflict bodily injury on or to terrorize the victim or another; or

"(d) to interfere with the performance of any governmental or political function; or

"(e) to hold another in a condition of involuntary servitude."

The intent to restrain and the restraint, for any of the enumerated purposes, are the facts the jury must determine to establish an

-14-

accused's guilt of aggravated kidnapping. No additional facts need be proved in order to constitute the crime.

The next question of Issue 10 is whether defendant's right to a jury trial includes the right to have the jury determine facts that relate only to the severity of punishment, once guilt has been established.

In Patterson v. New York, ____U.S.____, 97 S.Ct. 2318, 53 L ed 2d 281 (decided June 17, 1977), the United States Supreme Court held that a state may require a defendant to prove mitigating circumstances of severe emotional distress as an affirmative defense to a second degree murder charge. The challenge there turned on the defendant's contention that due process required the state prove beyond a reasonable doubt that he had not acted under the influence of severe emotional distress. The Court found the mitigating factor was a separate issue, neither presumed nor inferred to be an element of the crime from the statutory definition of the offense, and the state therefore did not have the burden of proving it.

In language relevant to the present case, Justice Powell in his dissent in Patterson stated:

> " * * * The Due Process Clause requires that the
> prosecutor bear the burden of persuasion beyond a
> reasonable doubt only if the factor at issue makes
> a substantial difference in punishment and stigma.
> The requirement of course applies a fortiori if
> the factor makes the difference between guilt and
> innocence. But a substantial difference in punish-
> ment alone is not enough. It must also be shown
> that in the Anglo-American legal tradition the
> factor in question historically has held that
> level of importance. * * *" 53 L ed 2d 302.

Here, we are concerned with a statute having a bifurcated sentencing provision rather than a statute that separately allocates the burden of proof, as in Patterson. However, the present case and Patterson, both, focus on the status of a fact neither by tradition nor by statute a necessary element of the crime charged. The majority decision and Justice Powell's dissent in Patterson indicate

that when the presence or absence of such a fact determines only the severity of punishment, it need not be proved by the state beyond a reasonable doubt. The release or nonrelease of a kidnapper's victim is such a fact, and it is within the power of the state to allow the trial court, rather than the jury, to make this factual determination.

Issue 11. Defendant next contends the 100 year sentence imposed by the trial court was error. Defendant argues that since the jury acquitted him on the deliberate homicide charge, it necessarily follows it found he had not accompanied the victim to Giant Springs. Defendant asserts his abandonment of the enterprise at the barracks exit limits his punishment under the applicable statute to a maximum of 10 years.

Section 94-5-303(2) provides a maximum sentence of 10 years for a person convicted of aggravated kidnapping when the accused voluntarily released the victim, alive, in a safe place, and not suffering from serious bodily injury. Defendant maintains that under the facts of the present case, as found by the jury, he did voluntarily release John Walsh, Jr. alive and not suffering from bodily injury in a safe place, the Malmstrom Air Force Base barracks where defendant and Walsh lived.

Even assuming that Walsh was alive and not seriously injured when defendant claims to have left him with Vample and Evans, it cannot be said defendant released Walsh in a "safe place". It defies logic to say that a location is, as a matter of law, "safe" for a person who there was struck by a lamp, threatened with a gun, assaulted with a syringe filled with battery acid, bound, gagged and wrapped in a blanket.

This was not a release in a "safe place" as would entitle defendant to receive the benefit of the lesser sentence, and there was no inconsistency in sentencing this defendant to the greater

sentence, even if he had no further participation in the events that culminated in Walsh's death.

Issue 12. In his final issue defendant challenges the methods employed by the trial court in conducting its own presentence investigation following defendant's conviction. The record shows that at various times and places between September 19, 1974, when the jury returned its verdict, and October 15, 1974, the date of the presentence hearing, the trial judge personally interviewed several persons who testified at the trial. The day after the trial concluded, the trial judge interviewed witness Jimmy Lee Thomas at Malmstrom. On the night before the hearing on defendant's bail request, the trial judge interviewed witnesses Billy Naray Evans and Larry Vample at the Cascade County jail. On the day of the bail hearing, the trial judge interviewed witness Hiram McDonald at an undisclosed location. Also interviewed, at times and places not appearing in the record, were witnesses Fay McRoberts and Marion Johnson, Jr.

No record was made of any of these interviews, and no notice was given to defendant or his counsel of the trial court's intent to conduct the interviews. When defense counsel learned of the trial court's actions in this regard, during an in-chambers discussion just prior to the opening of the presentence hearing, he moved the trial judge to disqualify himself from the sentencing of defendant. The motion was denied, and the question here is whether it was proper for the trial court to act as the sentencing judge in light of his out-of-court interviewing of several witnesses.

Defendant argues the trial judge should have disqualified himself. He relies primarily on Kuhl v. District Court, 139 Mont. 536, 366 P.2d 347 (1961), and State v. Simtob, 154 Mont. 286, 462 P.2d 873 (1969). In both cases this Court held that the reliance on information privately received by a sentencing judge is an abuse of the judge's sentencing discretion. However, neither case is controlling here.

-17-

In _Kuhl_, the Court was interpreting sentencing statutes, sections 94-7813 and 94-7814, R.C.M. 1947, repealed in 1967, and replaced by sections 95-2203, 95-2204, and 95-2205, R.C.M. 1947. The statutes are considerably different. In _Simtob_, the Court was interpreting a provision of the Dangerous Drug Act (section 54-133, R.C.M. 1947) which provides that a first-time offender under 21 is presumptively entitled to a deferred imposition of sentence. The trial court relied on private information and sentenced defendant to a prison term. Defendant had no opportunity to meet this information. Relying on _Kuhl_, this Court held use of this privately received information to be improper.

In the present case, the controlling statutes are sections 95-2203, 95-2204, and 95-2205, R.C.M. 1947. Section 95-2203 provides that a presentencing investigation be prepared by a probation officer, when a defendant has been convicted of a crime which may result in a sentence of one year or more. Under section 95-2204, the probation officer is directed to inquire into, among other things, the circumstances of the offense. Section 95-2205 grants the sentencing judge the discretion to make the report, in full or in part, available to the defendant and to allow cross-examination of those who gave information included in the report.

The effect of these statutes on the question of whether a sentencing judge may receive and adopt information from sources other than the testimony of witnesses in open court was considered by this Court in State v. Orsborn, _____Mont._____, 555 P.2d 509, 33 St.Rep. 935, 939 (1976). There, we held that when a defendant is protected against a sentence predicated on misinformation, there is no due process violation when presentence information comes from a source not subject to cross-examination in court. _Orsborn_, supra.

The specific protections found to have been present in _Orsborn_ included: 1) defendant was represented by counsel at the

time the sentencing information was made known to him; 2) the defendant had the opportunity to rebut the information; and 3) the defendant chose to affirm the accuracy of the information. Orsborn, however, cannot be read to mean that in every case in which a sentencing judge goes beyond the confines of a presentencing investigation report, the sole question is whether or not subsequent proceedings afford the defendant an opportunity to correct inaccuracies in the judge's information.

When, as in the present case, the sentencing judge becomes a private fact gatherer, he thereby oversteps his legitimate role as a fact finder in the sentencing procedure. Whether or not the defendant is "protected" from misinformation is irrelevant.

There is no doubt the trial judge's primary motivation in conducting the interviews was to get the "full story" of the killing of John Walsh, Jr. The trial judge stated he was "satisfied the bulk of these witnesses there have a lot more to say than what we heard at this trial". The interviews were designed, at least in part, to find what was left out of their testimony.

The trial judge characterized his discretion as a sentencing judge as being limited only by the requirement that "anything I use be presented in open Court, so that there is no sand bagging." While the court's sincere efforts at full disclosure of and granting access to the sources of his presentence information are laudable, they cannot remove the prejudice to defendant that attached the moment the trial judge began his informal and private retrial of the case.

A sentencing judge may not conduct his own presentence investigation by privately interviewing persons he believes to know more than they have told. By doing this, he becomes a fact gatherer as well as a fact finder, and thereby subjects a defendant to an impossible burden. Realistically, there is no way a defendant can

dislodge from a judge's mind, the results of his own personal investigation. It is only natural that a judge has at least a subconscious bias supporting the techniques used and the results of his own investigation. The judge, by this process, has unwittingly become intimately connected with the accusatory process. In this case, for example, cross-examination of the witnesses whom the judge had privately interviewed, would only serve to make the court guardian of those conclusions he adduced from his personal investigation. Moreover, assuming a witness had not told the truth to the trial judge during the private investigation, it is unlikely such witness would, on the witness stand, admit that he had on a previous occasion, lied to the very judge hearing his testimony. We must not forget that the presence of a **judge** in a role as a private investigator, can be intimidating, if not coercive.

This is not to say the trial court cannot acquire more information as to the circumstances of a crime. We only hold that if it is his desire to do so, he must delegate that responsibility to other officials. They can gather the information and put it in a report to be made available to the defense. At the presentencing hearing, if anything in the report is contested, these officials may then be cross-examined as to the investigation and the results of their investigation. Here, it would be an impossible burden to suggest that the defendant if he desired, could cross-examine the trial judge as to the methods he employed, and the results of his private investigation.

Here, because the trial judge became so intimately involved in the presentence fact gathering process, it is clear he should have disqualified himself from sentencing the defendant. His failure to do so requires the sentence be vacated.

In so holding, we emphasize that we reaffirm our adherence to the sentencing policy stated in Orsborn, supra, quoting from

Williams v. New York, 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337, 1342:

> "'* * * Highly relevant--if not essential--to [the sentencing judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.'"

However, the United States Supreme Court also stated in Williams, supra:

> " * * * Leaving a sentencing judge free to avail himself of out-of-court information * * * does secure to him a broad discretionary power, one susceptible of abuse. * * *" (Emphasis added.)  93 L.Ed. 1344.

It is clear that in this case this sentencing discretion was abused.

We affirm the defendant's conviction; vacate the sentence imposed; and, remand for resentencing.

_Daniel J. Shea_
Justice

We Concur:

_Dane Henson_
Chief Justice

_John Conway Harrison_

_Frank J. Haswell_
Justices

-21-