FILED

09/19/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0202

DA 21-0202

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 172

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

SEIDEL PINE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DC-18-330
Honorable Robert J. Whelan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Appellate Defender, Deborah S. Smith, Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Christine Hutchison, Assistant Attorney General, Helena, Montana

            Eileen Joyce, Butte-Silver Bow County Attorney, Kelli Johnson Fivey, Deputy County Attorney, Butte, Montana

Submitted on Briefs:  June 28, 2023

Decided:  September 19, 2023

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 A jury convicted Seidel Pine (Pine) in the Second Judicial District Court, Silver Bow County, of aggravated kidnapping, sexual intercourse without consent (SIWOC), and partner or family member assault (PFMA). Pine appeals.

¶2 We affirm and restate the issues on appeal as follows:

1. *Is Montana Code Annotated § 45-5-303(2), MCA, facially unconstitutional because it permits a judge, rather than a jury, to find facts that reduce the maximum penalty?*
2. *Did the District Court abuse its discretion by designating Pine a level three sex offender?*
3. *Was Pine's counsel ineffective for failing to argue the maximum sentence for kidnapping was 10 years based on mitigating factors and for failing to object to Pine's level three sex offender designation?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The charges in this case arose following a report from a female, K.R., who stated she had been in a relationship with Pine, and he had held her against her will while he sexually assaulted her, including nonconsensual sexual intercourse. Pine and K.R. were previously married and have four children together. In November of 2018, Pine and K.R. reconnected and traveled from Missoula to Butte in K.R.'s Jeep Cherokee (Jeep) to a house Pine was sharing with three other people. During their time in Butte, Pine and K.R. consumed alcohol and used methamphetamine with Pine's roommates and friends.

¶4 K.R. and Pine partied in town for about two weeks without any problems. However, following an argument on November 17, during which Pine's phone was broken, the relationship began to deteriorate. K.R. testified that she unintentionally broke Pine's phone after swatting it out of his hand. Pine testified that K.R. intentionally broke his phone by

2

slamming it on the street. Both agreed that after his phone was broken, Pine became angry and slashed one of K.R.'s tires. They continued to argue until law enforcement intervened after a neighbor called 911. The interaction did not result in any charges being brought and Pine and K.R. ultimately returned to Pine's house after Pine replaced K.R.'s tire with a spare. Upon returning to Pine's house, Pine took K.R.'s phone and car keys and forced her to remain in his room.

¶5 From November 17 to November 23, Pine forced K.R. to undress and remain naked and confined in Pine's room. During this time, she was not allowed to shower or use the bathroom without Pine's permission. Pine would sleep next to the bedroom door to prevent her from escaping. Pine denied that he ever forced K.R. to remain in the house and maintained that she was always free to leave. On November 23, K.R. and Pine left Pine's house and traveled to Bozeman. On the way, they stopped at a gas station in Belgrade where Pine entered the store and K.R. remained in the Jeep. K.R. explained that Pine left the keys in the Jeep which enabled her to escape. However, she was pulled over by law enforcement from Belgrade for having a broken tail light shortly after exiting the parking lot.

¶6 When Pine exited the gas station, he noticed K.R. had left with the Jeep and was not sure where she had gone. Pine observed "cop car lights going on and off" down the road and walked towards them thinking it might be K.R. Upon arriving at the Jeep, Pine attempted to peer into K.R.'s window but was stopped by the officers. Both Pine and K.R. were detained and brought to the police station where K.R. made a statement. K.R. was

3

allowed to return to her Jeep and Pine was later released to a homeless shelter. After returning to her Jeep, K.R. drove to a hotel and asked to use a computer so that she could message her sister on Facebook Messenger. While on Facebook Messenger she received a message from Pine stating "Where are you baby?" and promising to give her gas money to get back to Missoula if she would drive him back to Butte.

¶7    K.R. testified that she picked Pine up and they returned to Butte but that upon returning Pine again brought her into the house and forced her to strip naked. She stated that after their return to Butte, Pine was even angrier and he began using a "taser" on her.[1] She estimated that Pine used the stun gun on her around 50 times prior to her ultimate escape. K.R. testified that sometimes Pine would stun her quickly and other times he would press it against her skin longer. Pine denied K.R.'s claims and stated that while he did own a stun gun, it was also a flashlight and only the flashlight worked on the device.

¶8    On November 26, 2018, K.R. and Pine left the house to get food. While in the Jeep, K.R. opened a beer and started drinking. This apparently upset Pine. Pine smacked the beer out of K.R.'s hand, and K.R. testified she knew "[she] was probably going to get beat up pretty bad." K.R. attempted to grab the keys out of the ignition but because the Jeep was still in gear, she was unable to remove them. This made Pine even angrier and, fearing for her safety, K.R. grabbed the steering wheel and jerked it, hoping to cause an accident. The Jeep sideswiped another vehicle, but Pine did not stop. Instead, Pine told K.R. to

---

[1] Throughout the trial the device was often referred to as a "taser," but TASER is a brand of electric shock weapons. It would be more accurately labeled a stun gun as it was a close-range weapon that required skin contact and was incapable of firing projectile prongs.

4

remove her clothing and pulled off onto a secluded road. K.R. testified that she believed Pine might kill her and so complied.

¶9 After stopping on a secluded road, Pine told K.R. to get out of the Jeep and fix the tail light. As K.R. walked towards the back of the Jeep, Pine came up to her and punched the side of her head—which caused K.R. to fall onto the snow-covered ground. Pine then proceeded to kick K.R. while she curled into a ball. He then used the stun gun on her, punched her, and used a knife to cut off portions of her hair. During trial, Pine admitted he "backhanded [K.R.] a couple times" after she caused the accident and he did kick her "two or three" times but denied using a stun gun on her or cutting her hair. K.R. testified that after Pine finished beating her, he drove to a new location where he pulled over and told K.R. to have sex with him while raising his hand as if to strike her. K.R. said she did not want to, but Pine told her to "[s]it your ass up and fucking get on" and that he was "going to take it" anyway. K.R. complied and got on top of Pine. However, Pine complained that she was making no effort or participating and so ordered K.R. to turn around and continued to sexually assault K.R. from behind and to have sexual intercourse with her. Throughout the assault, K.R. told Pine she did not want to participate, but he did not listen. Pine denied assaulting K.R. and maintained that the intercourse was consensual. Afterwards, Pine told K.R. to get dressed and he drove to a liquor store and bought vodka. K.R. described how Pine would use the stun gun in his pocket to scare and intimidate her into compliance by activating it so she would hear the "snapping noise," causing her to feel she could not leave.

5

¶10     Pine continued to confine K.R. in his home. On November 28, 2018, K.R. managed to borrow a phone from someone in the house and messaged her sister stating that she needed help and that she was trying to escape. That evening law enforcement came to the house but after announcing their presence everyone in the house remained silent and Pine ordered K.R. to be quiet and to go upstairs to his room. After law enforcement left, Pine opened the front door and told K.R. she could leave but he had the stun gun in his left pocket and a knife in his right pocket and K.R. believed that if she tried to leave, he "was going to tase me and stab me."

¶11     On November 29, 2018, K.R. made the decision she was going to escape or, if she could not leave, was "going to kill myself because I [didn't] want [Pine] to have the satisfaction of taking my life." That morning, police came a second time to the residence, but Pine again prevented K.R. from answering the door. K.R. attempted to leave while Pine was busy helping one of his roommates who had locked her keys in her car. However, Pine noticed that K.R. was attempting to leave and brought her back into the house where he made her take her clothes off and put on "some really dingy clothes." Pine once again grabbed the stun gun and knife, opened the front door, and told her that if she wanted to leave, she could. This time K.R. left and began walking down the street with Pine following behind her. While walking, she encountered a woman getting into her car and K.R. asked for a ride, but Pine got into the car as well. The woman took K.R. and Pine to Stokes Grocery store. K.R. testified that after the woman left, she began crying loudly in

order to make a scene. Pine left and K.R. entered the store and asked the first person she met to call law enforcement. Pine was later arrested at his residence.

¶12 K.R. was taken to the hospital where she was examined by Nadine Eikbush, a registered nurse, and interviewed by Detective Sergeant Jeff Williams. Sergeant Williams testified K.R. was visibly upset and had several injuries, including a black left eye and bruising. Nurse Eikbush testified K.R. had a large bruise on her right posterior thigh and buttock area and broken skin all over her body. K.R. indicated the broken skin marks were from the stun gun. Detective Williams went to Pine's residence and retrieved the stun gun from an upstairs bedroom. He confirmed at trial that the stun gun worked and demonstrated to the court and jury how it sounded when it was activated.

¶13 Following a three-day trial, Pine was convicted by a jury on all counts. The District Court sentenced him to a term of 50 years in prison for aggravated kidnapping, 20 years for SIWOC, and 1 year for PFMA. The Court ran the sentences for aggravated kidnapping and SIWOC concurrently but suspended 15 years. Pine was designated a level three sex offender based in part on the recommendation of the forensic examiner.

## STANDARD OF REVIEW

¶14 We review a claim that a sentence violates the constitution and that a district court violated a defendant's rights at sentencing de novo. *State v. Keefe*, 2021 MT 8, ¶¶ 10-11, 403 Mont. 1, 478 P.3d 830. When reviewing "legislative enactments, the constitutionality of a legislative enactment is *prima facie* presumed, and every intendment in its favor will be made unless its unconstitutionality appears beyond a reasonable doubt." *State v. Sedler*,

2020 MT 248, ¶ 5, 401 Mont. 437, 473 P.3d 406. Furthermore, "the party challenging a statute bears the burden of proving it is unconstitutional beyond a reasonable doubt and, if any doubt exists, it must be resolved in favor of the statute." *Sedler*, ¶ 5.

¶15 We review a district court's designation of a sexual offender level for abuse of discretion. *State v. Hill*, 2009 MT 134, ¶ 22, 350 Mont. 296, 207 P.3d 307. The district court designates a sexual offender level in its discretion and is not required to accept the recommendation of a psychosexual evaluation. *Hill*, ¶ 42. "A district court abuses its discretion when it 'acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice.'" *Hill*, ¶ 42. We generally refuse to review on appeal an issue which the party failed to object to at the trial court unless it is "a criminal sentence that is alleged to be illegal or in excess of statutory mandates . . . ." *State v. Kotwicki*, 2007 MT 17, ¶ 8, 335 Mont. 344, 151 P.3d 892. "[A] sentence is not illegal if it falls within statutory parameters." *Kotwicki*, ¶ 13.

¶16 Ineffective assistance of counsel (IAC) claims present mixed questions of law and fact and are reviewed de novo. *State v. Ward*, 2020 MT 36, ¶ 15, 399 Mont. 16, 457 P.3d 955. If the claim is based on matters outside the record, we will not review it on direct appeal, recognizing that the defendant may raise the issue in a postconviction proceeding to develop a record as to the reasons for counsel's actions. *Ward*, ¶ 20. When considering whether counsel was deficient, we do not analyze the conduct with hindsight but rather we presume that counsel's conduct falls within a range of acceptable professional assistance,

8

and a defendant must overcome that presumption. *State v. Schowengerdt*, 2018 MT 7, ¶ 31, 390 Mont. 123, 409 P.3d 38.

## DISCUSSION

¶17    *1.  Is Montana Code Annotated § 45-5-303(2), MCA, facially unconstitutional because it permits a judge, rather than a jury, to find facts that reduce the maximum penalty?*

¶18    We first note that Pine failed to raise a constitutional challenge to § 45-5-303(2), MCA, in the District Court.  Therefore, on appeal Pine may only challenge the facial constitutionality of the statute.  See *State v. Ber Lee Yang*, 2019 MT 266, ¶ 10, 397 Mont. 486, 452 P.3d 897 ("We differentiate between the types of constitutional challenges that we will address for the first time on appeal . . . . [A] claim that a statute authorizing a sentence is unconstitutional on its face may be raised for the first time on appeal, but the exception does not apply to as-applied constitutional challenges.") (internal citations omitted).  Pine asserts that § 45-5-303(2), MCA, is facially unconstitutional because it allows a judge to determine facts which Pine claims must go to the jury.[2]

¶19    Pine argues that this Court's holding in *State v. Stewart*, 175 Mont. 286, 573 P.2d 466 (1977), conflicts with the United States Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000).  Specifically, Pine claims that the "unless" wording in § 45-5-303(2), MCA, relieves the State of its burden to prove each element of the charged offense at trial.  The statute in question provides that a person convicted of

---

[2] We note that the Court, pursuant to its Internal Operating rules, Section IV.1, is to determine a challenge to the constitutionality of a statute en banc.  However, given the law on this issue is settled, we deem it appropriate to resolve the question by a five-justice panel.

aggravated kidnapping shall be sentenced to a minimum of two years and up to 100 years in prison and fined up to $50,000, "unless the person has voluntarily released the victim alive, in a safe place, and with no serious bodily injury . . . ." Section 45-5-303(2), MCA. If all three of these factors are met, then the defendant's sentence is limited to not less than two years or more than 10 years.

¶20     We considered a similar issue in *Stewart*, when we addressed whether a statute was "unconstitutional because it require[d] the trial court to make a finding of fact, thereby violating [the] defendant's right to have all facts submitted to and determined by the jury." 175 Mont. at 299, 573 P.2d at 1145. The question was whether "an accused's voluntary release of or failure to release his victim in a safe place, alive and not suffering from serious bodily injury, has any bearing on his guildt [sic] or innocence of the crime of aggravated kidnapping." *Stewart*, 175 Mont. at 299, 573 P.2d at 1145.

¶21     In *Stewart*, Stewart was arrested and charged with one count of deliberate homicide and two counts of aggravated kidnapping. *Stewart*, 175 Mont. at 289-90, 573 P.2d at 1140. Stewart, who was an airman stationed at Malmstrom Air Force Base near Great Falls, had been involved in a court-martial proceeding and suspected that John K. Walsh, Jr., (Walsh), a fellow airman, may have been the informant against him. *Stewart*, 175 Mont. at 288-89, 573 P.2d at 1140. Stewart and six other airmen discussed the possibility that Walsh may have been an informant and the group decided to confront him. *Stewart*, 175 Mont. at 288-89, 573 P.2d at 1140. After being confronted, Walsh denied he was an informant. A scuffle ensued and Walsh was subdued, wrapped in a blanket, and his mouth was taped

shut. *Stewart*, 175 Mont. at 289, 573 P.2d at 1140. Walsh's body was found at the Giant Springs recreation center having been shot once in the chest and three times in the head. *Stewart*, 175 Mont. at 289, 573 P.2d at 1140. Stewart was convicted at trial and sentenced to 100 years in prison. *Stewart*, 175 Mont. at 290, 573 P.2d at 1140.

¶22 On appeal, Stewart argued that the statute for aggravated kidnapping[3] was unconstitutional as "it require[d] the trial court to make a finding of fact, thereby violating defendant's right to have all facts submitted to and determined by the jury." *Stewart*, 175 Mont. at 299, 573 P.2d at 1145. Stewart argued that whether he released his victim alive, in a safe place, and not suffering serious bodily injury were findings that have a bearing on guilt and therefore the law requires a jury to decide. This Court concluded that "[c]learly it does not." *Stewart*, 175 Mont. at 299, 573 P.2d at 1145. We reasoned that the "intent to restrain and the restraint" were the necessary facts that the jury must consider to establish the crime of aggravated kidnapping and that the other factors were merely "facts that relate only to the severity of punishment, once guilt has been established." *Stewart*, 175 Mont. at 300, 573 P.2d at 1146. This Court explained that "[n]o additional facts need be proved in order to constitute the crime." *Stewart*, 175 Mont. at 300, 573 P.2d at 1146.

¶23 Section 45-5-303(1), MCA, states that an individual commits the offense of aggravated kidnapping if they "knowingly or purposely and without lawful authority restrain[] another person by either secreting or holding the other person in a place of

---

[3] Stewart was convicted pursuant to § 94-5-303(2), R.C.M. 1947, which is virtually identical to § 45-5-303(2), MCA.

11

isolation or by using or threatening to use physical force . . . ." As previously decided in *Stewart*, the intent to restrain and the restraint itself, for any of the enumerated purposes, are facts the jury must determine to establish the defendant's guilt. Here, as in *Stewart*, whether the Defendant voluntarily released the victim, in a safe place, and without serious bodily injury are factual findings beyond what must be shown to prove aggravated kidnapping. When a jury returns a verdict of guilty to aggravated kidnapping, the existence of every element necessary to establish the offense has been established beyond a reasonable doubt and a court may impose the sentence authorized by statute up to the maximum penalty. See *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068 (1970). Anything that reduces the maximum penalty authorized by the statute does not have to be determined by a jury.

¶24 Pine argues that the United States Supreme Court's subsequent decision in *Apprendi* conflicts with our holding in *Stewart*. In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that *increases* the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S. Ct. at 2362-63 (emphasis added). However, in *Apprendi*, the Court specifically noted the distinction between facts in aggravation of punishment and facts in mitigation, when it explained that if a defendant:

> can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the [j]udge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone.

12

530 U.S. at 490, 120 S. Ct. at 2363 n. 16. Accordingly, in the present case, the District Court's sentence did not exceed the statutory maximum sentence authorized by § 45-5-303(2), MCA, and the statutory mitigating factors were not required to be submitted to a jury for consideration.

¶25     Further, in *Blakely v. Washington*, the United States Supreme Court clarified its holding in *Apprendi* stating "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." 542 U.S. 296, 303-04, 124 S. Ct. 2531, 2537 (2004). "When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,'. . . and the judge exceeds his proper authority." *Blakely*, 542 U.S. at 304, 124 S. Ct. at 2537. Here, a jury convicted Pine after it found that the State had established beyond a reasonable doubt all the elements of kidnaping; that is, Pine knowingly and without lawful authority restrained K.R. in a place of isolation by using threats of physical force. The jury's verdict that Pine was guilty of aggravated kidnapping authorized the District Court to impose sentence within the statutory parameters. Based on *Apprendi*, *Blakely*, and *Stewart*, § 45-5-303(2), MCA, is not facially unconstitutional because a judge, rather than a jury, may apply factors that mitigate sentence.

¶26     *2. Did the District Court abuse its discretion by designating Pine a level three sex offender?*

¶27     Pine argues for the first time on appeal that his level three offender designation failed to meet statutory requirements. Specifically, Pine argues that under

13

§ 46-23-509(1)(c), MCA, a defendant cannot be designated as a level three offender without the sexual offender evaluator or the court making specific findings that "the risk of a repeat sexual offense is high, there is a threat to public safety, and the sexual offender evaluator believes that the offender is a sexually violent predator." Section 46-23-509(1)(c), MCA. Although § 46-23-509(1)(c), MCA, establishes criteria which warrant a tier 3 designation, the statute contains no requirement that either the sex offender evaluator or the court make specific findings on the criteria.

¶28 First, we must conclude that Pine has failed to preserve this issue for appeal. In *State v. Lenihan*, this Court established that an appellate court can "review any sentence imposed in a criminal case, if it is alleged that such sentence is illegal or exceeds statutory mandates, even if no objection is made at the time of sentencing." 184 Mont. 338, 343, 602 P.2d 997, 1000 (1979). However, this exception was distinguished in the subsequent case *Kotwicki*.

¶29 In *Kotwicki*, Kotwicki argued that his sentence which included a fine was illegal because the district court did not inquire and make specific findings as required by § 46-18-231(3), MCA, on Kotwicki's financial resources prior to imposing a fine. *Kotwicki*, ¶ 7. Kotwicki failed to raise an objection at sentencing and argued that the *Lenihan* exception applied allowing him to raise the issue on appeal. *Kotwicki*, ¶ 9. However, this Court rejected that argument noting that "[w]e consistently have held that a sentence is not illegal if it falls within statutory parameters." *Kotwicki*, ¶ 13. Furthermore, we noted "that a sentencing court's failure to abide by a statutory requirement rises to an

objectionable sentence, not necessarily an illegal one that would invoke the *Lenihan* exception." *Kotwicki*, ¶ 13. In Kotwicki's case, his fine fell within the parameters authorized by § 46-18-231, MCA, and therefore was not illegal for the purposes of the *Lenihan* exception. *Kotwicki*, ¶ 16. Similarly, in the present case, Pine's designation as a level three offender fell within the parameters authorized by § 46-23-509(1)(c), MCA.

¶30 Notwithstanding Pine's failure to object to his tier designation, we note the statute in question states that "[p]rior to sentencing of a person convicted of a sexual offense, a sexual offender evaluator . . . shall provide the court with a psychosexual evaluation report recommending one of the following levels of designation . . . ." Section 46-23-509(1), MCA. While the three factors are present in the level three designation description, there is nothing in the language of the statute requiring the evaluator specifically address all three factors in their report. Rather, the statute clearly states that the evaluator's role is to provide the court with a level recommendation whereupon the court shall "review the psychosexual evaluation report, any statement by a victim, and any statement by the offender" and then "designate the offender as level 1, 2, or 3 . . . ." Section 46-23-509(2)(a)-(b). This indicates that it is ultimately the decision of the sentencing court to determine which level a sexual offender will be assigned and that the court may consider factors outside of the sexual evaluator's report when making this determination.

¶31 In the psychosexual evaluation report prepared by Christopher E. Quigley, LCSW, Quigley provided the Court with his recommendation that Pine be designated a level three sexual offender. During sentencing, the State asked the District Court to consider

15

everything it had heard over the course of the trial. Over the course of the trial, the Court heard testimony of numerous instances in which Pine utilized a stun gun to control K.R. and how he beat and sexually assaulted her. Additionally, the Court heard testimony that Pine isolated K.R. from others by confiscating K.R.'s keys and phone to prevent her from leaving or seeking help, that he forced her to strip naked in order to prevent her from attempting to escape the house, and that he physically pulled her back into the house and Jeep when she made attempts to leave. Thus, notwithstanding Pine's failure to object, there was abundant evidence to support the Court's decision to designate Pine a level three sexual offender.

¶32 We conclude that Pine's level three offender designation was objectionable, not illegal, and having failed to object to the designation during sentencing Pine did not properly preserve it for appeal. Additionally, the evidence amassed during trial clearly indicated that Pine met all the necessary criteria for a tier 3 designation.

¶33 *3. Was Pine's counsel ineffective for failing to argue the maximum sentence for kidnapping was 10 years based on mitigating factors and for failing to object to Pine's level three sex offender designation?*

¶34 Defendants "may raise only record-based ineffective assistance of counsel claims on direct appeal." *State v. Meredith*, 2010 MT 27, ¶ 51, 355 Mont. 148, 226 P.3d 571. This Court "distinguish[es] record-based from non-record-based claims based on whether the record fully explains why counsel took, or failed to take, a particular course of action." *Meredith*, ¶ 51. If we are unable to reference the record to determine "why" counsel did or did not perform as alleged then "the claim is based on matters outside the record on

16

appeal, [and] we will refuse to address the issue on appeal . . . ." *State v. Kougl*, 2004 MT 243, ¶ 14, 323 Mont. 6, 97 P.3d 1095. Instead, the defendant may "file a postconviction proceeding where he/she can develop a record as to 'why' counsel acted as alleged, thus allowing the court to determine whether counsel's performance was ineffective or merely a tactical decision." *Kougl*, ¶ 14.

¶35 Pine argues on appeal that his trial counsel was deficient at sentencing when he requested a sentence twice as long as the applicable statutory maximum. Additionally, Pine argues that his counsel was ineffective when he "failed to challenge a plainly incorrect Tier 3 sexual offender designation."

¶36 This Court reviews IAC claims under the two-prong test articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). A successful IAC claim "requires that the defendant show: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defendant." *Avery v. Batista*, 2014 MT 266, ¶ 26, 376 Mont. 404, 336 P.3d 924. The burden falls on the defendant to overcome the presumption that counsel's representation did not fall "within a range of acceptable professional assistance . . . ." *Schowengerdt*, ¶ 31.

¶37 As we have already determined that Pine's sentence did not exceed the statutory maximum and that the District Court did not abuse its discretion when designating Pine a level three sexual offender, both of Pine's IAC claims must fail under *Strickland*. Pine's counsel requested a 30-year sentence with 15 years suspended—a sentence well under the 100-year statutory maximum and much less than the State's request for a total sentence of

60 years with 20 years suspended. Additionally, although Pine's counsel did not argue that Pine should be designated a level one or two offender, there was ample evidence introduced during trial for the District Court to find that Pine met the requirements for a level three offender designation. Consequently, Pine's counsel's performance did not fall outside "a range of acceptable professional assistance . . ." when he elected not to argue for an even shorter sentence or lower offender designation. *Schowengerdt*, ¶ 31. Because a defendant must meet both prongs of the *Strickland* test, "if an insufficient showing is made regarding one prong, there is no need to address the other." *Adams v. State*, 2007 MT 35, ¶ 22, 336 Mont. 63, 153 P.3d 601.

## CONCLUSION

¶38 We conclude that § 45-5-303(2), MCA, is not facially unconstitutional because a judge, rather than a jury, may apply factors that mitigate sentence. Furthermore, Pine's level three offender designation was objectionable, not illegal, and having failed to object to the designation during sentencing Pine did not properly preserve it and cannot now raise it for the first time on appeal. Finally, both of Pine's IAC claims fail under *Strickland*.

¶39 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

18