THE STATE OF MONTANA, Plaintiff and Respondent, *v.*
JACK PHILLIPS, Defendant and Appellant.

No. 10946.
Submitted February 7, 1966. Decided March 16, 1966.
412 P.2d 205.

Mr. Chief Justice James T. Harrison and Mr. Justice Castles dissented.

Weber, Bosch & Kuhr, John B. Kuhr (argued), Havre, for appellant.

Morrison & Ettien, Havre, Forrest H. Anderson, Atty. Gen., Charles M. Joslyn, Asst. Atty. Gen. (argued), Helena, for respondent.

MR. JUSTICE DOYLE delivered the Opinion of the Court.

The defendant was tried in Hill County before the Honorable C. B. Elwell, Judge presiding on September 24, 1964, charged with eight counts of forgery. The county attorney moved for the dismissal of counts V, VI, VII and VIII. The trial court dismissed count IV. The defendant was also charged with a prior conviction of felony, which charge was destroying and injuring the jail at Havre on or about January 17, 1958.

The jury returned a verdict of guilty of forgery to the three remaining counts of the information on September 25, 1964. On September 28, 1964, sentence was pronounced on the defendant, consisting of 20 years on count I, ten years on count II, and ten years on count III, the sentences to run concurrently.

On October 28, 1964, the defendant filed a petition reciting that he was without money or means to pay for the bill of exceptions on his appeal to this court. On November 5, 1964, Judge Elwell signed an order that Hill County, Montana, would pay for the record on appeal and appointed John B. Kuhr as the court-appointed attorney for the defendant. Mr. Kuhr was not defense counsel in the trial.

Appellant in a well-reasoned brief cites three specifications of error but as the second specification is decisive in this cause, we will refrain from any discussion except as to that specification which reads: "The evidence adduced at the trial is insufficient to support the conviction as the record contains no evidence that the appellant knew that the checks were forgeries when he received and cashed them."

336

This court has, since its inception, consistently adhered to the following rule of law. It can be stated in its entirety as:

■ Any defendant is, at all stages of the proceedings in a case, where he is charged with a criminal offense, presumed to be innocent until he is proved guilty, by competent, relevant and material evidence, beyond a reasonable doubt.

■ Only such evidence, direct or circumstantial, or both, meeting the legal requirements, and such reasonable, legitimate inferences as may be legally drawn therefrom, can properly be considered by a trial court or jury in determining the guilt or innocence of the crime charged.

■ Mere conclusions based on supposition, assumption, conjecture or imagination, and not upon competent, legal and sufficient evidence, cannot, with proper regard for truth and justice, be permitted to assume the role of legitimate factual inferences in determining guilt or innocence. State v. Carns, 136 Mont. 126, 345 P.2d 735; State v. Elmore, 126 Mont. 232, 247 P.2d 488; State v. Woolsey, 80 Mont. 141, 259 P. 826; State v. McCarthy, 36 Mont. 226, 92 P. 521; State v. Riggs, 61 Mont. 25, 201 P. 272.

Under the carapace of the law above appearing we next address ourselves to the evidence that resulted in this conviction.

Appellant first met one Larry Gamron on either February 2nd or 3rd, 1964, at Havre, Montana.

Larry Gamron was on parole from Deer Lodge prison for forging his father's name, Ora C. Gamron, to checks several years prior to this date. The testimony is precise and clear that appellant did not know Larry Gamron prior to this day in February, 1964, neither did appellant know that Gamron was a convicted forger.

Appellant knew Larry Gamron's brother and on February 2nd or 3rd Gamron passing the appellant on First Street in Havre called to appellant. While they were visiting Gamron told appellant his car needed repair and appellant agreed to perform the task.

Appellant, a resident of Havre also had had experience as an auto mechanic. He owned a Buick car which he proposed to cannibalize for parts to repair the Gamron auto, using the tools and facilities that he had at his father's home. After installing the new transmission on the Gamron car, they test drove it and determined that the rear end mechanism should also be replaced which was done. Gamron agreed to pay appellant $100.00 for the parts and his labor. The three checks subsequently given appellant by Gamron for these parts and labor, precipitated this prosecution.

On the evening of the same day, appellant, in company with Larry Gamron, went to the home of Ora C. Gamron, and at that time and place, Ora C. Gamron, the complaining witness gave the appellant his personalized check for $5.00. Appellant cashed this check and gave the $5.00 in cash to Larry.

On the afternoon of February 5, 1964, the car being fully repaired, Larry Gamron gave appellant two personalized checks of Ora C. Gamron, the first check in the sum of $36.00 and the other in the sum of $27.50. Larry Gamron explained that he had his father make these checks in small amounts to facilitate cashing. Larry further stated that he would obtain the balance that evening from his father. He gave appellant a third check for $32.47 or a total of $95.97, telling appellant he would pay the $4.03 balance in cash.

Appellant having seen the signature of Ora C. Gamron and aware that the elder Gamron had given Larry a check the day before, cashed the three checks at three different business houses in Havre on February 5, 1964.

Mr. Paul V. Malmberg, cashier at the Citizens Bank of Montana at Havre, called as a witness for the State gave this cogent testimony relating to the signatures on the checks:

"Q. And normally, the bookkeeper who examines the signature is fairly familiar with the signature of each depositor or people who have a checking account? A. Normally they become quite familiar, yes.

338

"Q. If there are any irregularities, she would be able to detect it, would you say? A. Yes.

"Q. The fact that these checks cleared with a normal signature would indicate that the signature appeared to be that of Ora Gamron? Yes.

"Q. Now, did the bank or you or anyone make a complaint to the authorities as to the invalidity of these checks? A. No, we did not."

The plain, unvarnished fact is that the three checks in question represented the apex of a forger's art.

The following testimony of the confessed forger, Larry Gamron discloses the complete ignorance of the appellant that the three checks were forgeries.

"Q. I will hand you three checks that are introduced as exhibits in this case, Plaintiff's Exhibit 'A,' 'B,' and 'C.' Now, handing you Exhibit 'A,' I will ask you if you recognize that check? A. Yes, I do.

"Q. Did you make out that check? A. Yes, sir, I did.

"Q. And is that your father's true signature on the check? A. You mean, is that his true name?

"Q. No. His true signature. A. Did he write it?

"Q. Yeah. A. No, I wrote this.

"Q. In other words, you forged your father's name? A. Yes, sir, I did.

"Q. And that's Exhibit 'A,' a check in the amount of $36.00. Now, I will show you a check that's introduced as State's Exhibit 'B' for $27.50; and I will ask if you recognize that check? A. Yeah, I wrote that one too.

"Q. And did you also forge your father's name to that check? A. Yes, sir, I did.

"Q. Now, I will hand you State's Exhibit 'C' which is a check in the amount of $32.47; and I will ask you if you can recognize that? A. Yes, sir. This is the one—These are all the checks I gave Jack. I wrote this one (indicating). I wrote them all in fact.

"Q. And each of them are forged signatures? A. Yes, they are.

"Q. And why did you give him those checks? A. For the payment for working on my car.

"Q. And did he see you write them out? A. No, sir.

"Q. Was he aware that they were forged? A. Not to my knowledge he wasn't.

"Q. Did he accept those checks in payment for the work he did on the car? A. He did."

On the night of February 5, 1964, appellant and Larry Gamron left Havre and journeyed to Los Angeles where Appellant obtained a job as a driver for a wrecker truck company. He held this job until he was arrested on April 21, 1964.

He saw Larry Gamron from time to time but did not live with him.

About the first of March, appellant learned that the three checks were forgeries. He promptly called his father, Arvin D. Phillips at Havre and requested his father to pay the money from resources the appellant had at his home in Havre in the form of refund income tax checks.

Appellant's father paid the check for $36.00 to the Havre Super-Save, the check for $27.50 at Buttrey Foods. The $32.47 check to Safeway was paid but the money was returned to the witness.

The fact that restitution was made on two of the three checks would not exonerate the appellant, if he knew the checks were forged. See State v. Johnston, 140 Mont. 111, 367 P.2d 891.

The gravaman of check forgery consists of any person, who, *with intent* to defraud another, falsely makes, alters, forges, or counterfeits any check, or utters, publishes or passes or attempts to pass as true and genuine any false, altered, forged, or counterfeited matters with intent to prejudice, damage or defraud any person, is guilty of forgery. (R.C.M.1947, § 94-2001.)

■ Over the years this court has held that there are three essentials to the crime of forgery: (1) a false making of an instrument in writing; (2) *a fraudulent intent,* and (3) a writing which, if genuine, might apparently be of legal efficacy or the foundation of legal liability.

■ The evidence, such as it is cannot be held to be both consistent with the idea of guilt and inconsistent with any other rational hypothesis, if it does not meet this test with respect to the *knowledge* that the checks were forged, together with the *intent* of the defendant to utter forged instruments. Not being sufficient from an evidentiary standpoint to establish these essential facts beyond a reasonable doubt, it does not sustain the judgment of conviction despite some suspicious circumstances. A conviction cannot rest upon mere suspicion or conjecture.

The judgment of conviction is reversed and remanded to the district court.

MR. JUSTICES JOHN C. HARRISON and ADAIR concur.

MR. CHIEF JUSTICE JAMES T. HARRISON, dissenting:

I dissent. I do not disagree with the rules of law set forth in the majority opinion, but I do believe there is sufficient direct and circumstantial evidence to prove the defendant guilty beyond a reasonable doubt.

The record here discloses that Ora C. Gamron is the father of Larry Gamron; the father's sole source of income is from social security in the sum of $150 per month; he is in very poor health, bedridden about half the time; he is cared for by a housekeeper who resides at his home.

The defendant testified that he did not know Larry Gamron until around the 2nd or 3rd of February, 1964, when as he was walking home late at night Larry Gamron pulled up in a car and hollered at him. He was asked:

"Q. Had he known you? A. Well, no. Personally, no, he

didn't know me. I knew his brother; and Larry had been around here, born and raised around here; and he thought he knew me coming down the street.

"Q. Did he have any purpose in talking to you or stopping you? A. Well, after we got acquainted and everything, he asked me where he could get his car fixed. I told him I'd fix it.

"Q. What kind of a car was it? A. 1953 Buick.

"Q. And have you any experience with car repairs? A. Yes, I have.

"Q. Did you have any equipment and place where such repairs could be made? A. Yes, I did.

"Q. Where was that located? A. In my father's house on the north side.

"Q. And what eventually resulted from his request to have his car repaired? A. I put a transmission, 3rd member in the rear end, and did a tune up job on his car. And on this, we agreed that the price would be $100; and his father had told him to get his car fixed in my presence; so, I fixed his car.

"Q. When were those repairs made, what date? A. We started the 4th day of February on it. We put the transmission in. We drove it to Fort Benton; and the 3rd rear end went out —didn't go out, was going out. We brought it back; and I put the rear end in.

"Q. When did you put the rear end in? A. Morning of February the 5th.

"Q. About how many hours did it take you to do that job? A. About 5, maybe 6 hours. We worked on it all morning.

"Q. And by 'we' do you mean who? A. Larry was there with me for a while.

"Q. Did he agree to pay you $100 for your services? A. Yes, he did."

On cross-examination with respect to this work he testified:

"Q. * * * Did you put any new parts in this automobile of Gamron's when you repaired it. A. I didn't put any new parts in it.

"Q. What kind of work did you do on it? A. Transmission and 3rd member in the rear end.

"Q. Are these used parts? A. Yes, they were.

"Q. Where did you obtain these parts? A. I had these parts myself. I used to have a '53 Buick. I junked it and stripped it down; and I still had the rear end and transmission and parts off the engine.

"Q. Have you other parts than these? A. I don't know if there is anything else still down there or not.

"Q. Just happened that you had all the parts you needed? A. Well, we had more parts than he needed.

"Q. Had the rear end, so you put that in on the morning of the 5th? A. Yes, I did.

"Q. So, you didn't have to pay anything from any place else? A. No."

As to the statement of defendant that Gamron's father had told him (Larry Gamron) to get his car fixed in his presence, the testimony of the father is that when defendant and Larry were at his home Larry asked his father for some money to fix up an old car with, and the father asked how much it would take and Larry found out and said $22.50 and the father told him "Yes, I could stand that much." A check was drawn for that amount and made payable to the Havre Auto Clinic.

Defendant admitted he had been previously convicted of a felony, also that he knew Larry Gamron was on parole from the state penitentiary at Deer Lodge. He was asked by the county attorney on cross-examination:

"Q. You knew that he was on parole at the time? A. Yes, I did."

The car of Larry Gamron had been purchased around January 31st for a price of $100 roughly. Gamron testified that after purchasing the car he had it repaired about three times at the Havre Auto Clinic. These repairs consisted of various electrical work, tuning and replacing. One time it was the starter solenoid; one time a wheel bearing; another time a

carburetor kit and some spark plug wiring or various things. That at Kellam's service station he had work done there that consisted of spark plugs, carburetor kit, he believed they changed the oil in the car and set the valve adjustment and what you would call general tune-up. Rather odd that with all these repairs he would ask a stranger where to get his car fixed.

Following their meeting on February 2nd or 3rd defendant and Larry Gamron remained in each others company much of the time, and visited regularly at the home of Larry's father. On February 4th they were there and defendant testified:

"Larry Gamron asked his dad if he had some money. He needed some money. Ora Gamron told him he didn't have any change, that he would give him a check. So Larry said, 'Well, you better make it out to Jack,' because he was on parole. He wasn't supposed to be in Havre; and he didn't want to be seen in the store. So, he made out the check to me. I took it to the North Side Grocery where I traded; and I cashed it. I gave Larry the $5.00."

As to the circumstances of his receipt of the checks on February 5th defendant testified:

"It was around 2:00 o'clock, or it was in the afternoon. Larry Gamron came over; he give me two checks. He said, 'Here is part of your money. I will get the other one tonight because I have to go see my dad. Now, I had these made out in small denominations so you wouldn't have any trouble cashing them.' And he left after that. And he came back, well it was pretty close to night time, and give me another check. So, I immediately went down and cashed the checks."

Defendant went to the Safeway store first and cashed the check for $32.47; then across the street to Buttreys where he cashed the check for $27.50; Gamron was not with him in Safeway or Buttreys when he cashed those checks but picked him up when he was coming from Buttreys; they then proceeded to the Havre Super Save where defendant cashed the check

for $36.00 and there he bought some cigarettes and groceries. The groceries they took to Gamron's father's house and Larry told the housekeeper that somebody had given them the groceries and they were leaving them for their use.

Later that evening defendant and Gamron went to Lee's Texaco service station where Gamron purchased gasoline then they rode around Havre until late that night or early morning when they departed from Havre with the intentions of going to Missoula, but it was snowing when they arrived in Helena so they changed their plans and went to Las Vegas, finally winding up in Los Angeles.

The court, in accordance with the law, charged the jury in relevant part that:

"You are the sole judges of the weight of the testimony and the credibility of the witnesses, and it is solely and exclusively for you to determine the facts, and this you must do from the evidence, and then apply the law as stated in these instructions. * * * You are to take into account in weighing the testimony of any witness, his interest or want of interest in the result of the case, his appearance upon the witness stand, his manner of testifying, his apparent candor or want of candor, whether he is supported or contradicted by the facts and circumstances in the case as shown by the evidence. You have a right to believe all the testimony of a witness or believe it in part and disbelieve it in part, or you may reject it altogether as you may find the evidence to be. You are to believe as jurors under the instructions of the Court and the evidence what you would believe as men, and there is no rule of law which requires you to believe as jurors what you would not believe as men. * * * It is possible always to question any conclusion derived from testimony, but such questioning is not what is a reasonable doubt. A reasonable doubt exists only in that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding

conviction of a moral certainty of the truth of the charge."

Guiding my review of the sufficiency of the evidence produced at this trial, and in accordance with the instructions given to the jury. I have no doubt as to the guilt of the defendant.

According to the record two previously unacquainted ex-convicts, one the defendant and the other still on parole from the penitentiary, met on a street late at night by reason of the parolee hollering at the defendant from a car. They became acquainted, so they say, and the parolee, who was then and had been a resident in his home town, asks the defendant where he can get his car fixed. The record is that the parolee had only purchased the car two or three days before and had already had it to some extent repaired in two different automobile establishments in Havre. However, defendant has the necessary materials to repair the car and an agreement is made that the repairs will cost the parolee $100. The defendant put no new parts in the automobile, he fortunately happening to have a junked, stripped-down car with the necessary parts to make the repairs. While the record does not indicate the time the defendant and parolee spent together working on the car on February 4th it does show that on that date after the repair work had been done they drove from Havre to Fort Benton and returned; on February 5th they worked on it all morning, about five, maybe six hours.

The defendant, in company with the parolee, during these couple of days visited at the home of the parolee's father constantly; on February 4th the parolee asked his father for money and received the $5 check previously referred to. The housekeeper testified that defendant and the parolee were again back at th home on February 4th as she put it "in the middle of the night," and at that time the parolee's father asked her if she had any change, that the parolee wanted to have some money for gas and she gave him $2. The father also, as previously stated, when advised that it would take $22.50

to repair the car, in the presence of defendant stated: "Yes, I could stand that much." Also defendant testified that he had been advised by Ora Gamron that he was on social security.

It is obvious that the parolee had no money and was constantly going to his father for that purpose and received $5 once, $2 another time, and a check for $22.50 to cover repairs on his car and defendant was aware of these facts because he was present on each occasion. Also even defendant's story of the $100.00 agreed price doesn't hold up because the checks do not total that amount.

Couple this knowledge of defendant with his story of the receipt of the three checks signed by Ora Gamron in payment of the repair bill, and the manner of cashing the same and departure from the city the same night, how could any juror believe that defendant accepted and cashed the checks in good faith. None of them did, and to me the stories told by Gamron and the defendant are not worthy of belief, in fact incredible. The only supposition, assumption, conjecture or imagination that appears in this record is in connection with the stories told by the defendant and his companion parolee.

Finally, defendant says he did not "learn" the checks were forgeries, but according to his own version he learned that the police were "questioning about me" and "that they wanted to question me about some bad checks. So, I called my father and asked him to go see if those checks had come back because them [sic] the only checks I had cashed. And them [sic] the only ones that it could be. Then I went to see Larry, and he told me that, well, his dad probably didn't have money in the bank to cover them." He was asked this question: "Did Larry tell you that he had forged his father's name to checks prior to this time? A. No, he didn't."

Then, according to defendant's father, defendant called him to go pay up some checks. It was defendant who called the checks bad. It was defendant whose guilty knowledge caused him to try to retrieve the incriminating checks.

To call all of this, and more, "mere suspicion or conjecture" tests one's credulity.

I believe, as did the jury, that the defendant knew the checks were forged when he uttered them and I would affirm the judgment.

MR. JUSTICE CASTLES:

I concur in the dissent of Mr. Chief Justice Harrison. Additionally I point out other fallacies in the majority opinion. The majority opinion predicates its discussion on the false *making* of a check. No one ever contended that Phillips *made* the check. He uttered and passed them. The majority opinion relies on the testimony of the admitted maker of the forgery to support its thesis that Phillips did not know the check was a forgery. Even Phillips, as Chief Justice Harrison points out, did not testify that he learned later the checks were forgeries. Not at all. He learned, according to his own version, that the police were "questioning about me."