No. 97-379

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 181

STATE OF MONTANA,

Plaintiff and Respondent,

v.

GERALD HEFFNER and

D.J. HEFFNER,

Defendant and Appellant.

APPEAL FROM: District Court of the Twentieth Judicial District,

In and for the County of Lake,

The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Richard L. Musick, Kalispell, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Pamela P. Collins, Assistant Attorney General, Helena, Montana; Deborah Kim Christopher, Lake County Attorney, Polson, Montana

Submitted on Briefs: March 19, 1998

Decided: July 21, 1998

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

**¶1 Gerald and D.J. Heffner (Appellants), father and son, were charged with threats and other improper influence in official and political matters, a felony, in violation of § 45-7-102(1)(b), MCA. Appellants were tried simultaneously in the Twentieth Judicial District Court, Lake County. A jury found each Appellant guilty and judgments of conviction were entered. Appellants jointly appeal the jury verdict and judgments of conviction. We affirm.**

**¶2 We address the following issues:**

**¶3 1. Was the evidence sufficient to support Appellants' convictions for the charged**

**offense?**

**¶4 2. Does the record support Appellants' claims of instructional error?**

**¶5 3. Is Appellants' constitutional challenge to § 45-7-102(1)(b), MCA, properly before this Court when it was not raised below?**

BACKGROUND

**¶6 On June 4, 1996, a crew of Lake County Road Department employees were working to widen the Lake Mary Ronan Road, and build a base for the road in preparation for asphalt. The road crew was using dump trucks, road graders, and belly dumps to accomplish this project. The dump trucks and belly dumps would dump gravel on the road, and the graders would berm the gravel in the middle of the road. Finally, the graders would make passes back and forth to flatten the berm. In flattening the berm, it was not uncommon for rocks as large as one foot in diameter to turn up and be pushed to the outer edges of the road. The particular stretch of road under construction consisted of about one and one half miles, from the junction of Lake Mary Ronan and Camp Tuffit Roads to the entrance of Mountain Meadow Lodge. "Men Working" and "35 mph" signs were posted at each end of the construction zone.**

**¶7 When doing this type of road work, it is not possible for cars to use the road until the grader operator periodically opens the road for cars to pass. On days of heavy traffic, flaggers are used to control access to the stretch of road under construction. However, on light to medium traffic days, the road crew operators control access to the road themselves by using road signs and radios to inform each other when to let cars pass, and to warn each other of "fast movers." On June 4, 1996, although "a lot" of cars were using the stretch of road under construction, traffic was not heavy enough to require the use of flaggers. Thus, the road crew operators controlled traffic themselves.**

**¶8 At approximately 10:00 a.m., Appellants were traveling on Lake Mary Ronan Road and came upon the construction zone on their way to picking mushrooms. Appellants admit that they saw the signs and the road crew operators working. Appellants traveled through the construction zone with no problems.**

¶9 Later that day, at about 2:30 p.m., Appellants had finished picking mushrooms and were again traveling on Lake Mary Ronan Road. Charlie Adams (Adams), a road grader operator, was backing up the grader while in the process of spreading gravel. Adams looked in front of him and behind him using his rear view mirrors and saw no one. He glanced down at his blade for a few seconds, then looked up in his rear view mirror and saw Appellants' truck come around the edge of the left side of his grader. The truck was traveling at a high rate of speed, and Adams panicked. He saw the truck go into the ditch on the left side of the road. When the truck came to a stop, the truck's passenger side wheels were on the left shoulder of the road, and the rest of the truck was down into the ditch. The back of the truck was even with the front of Adams' grader. Adams continued backing up because he knew he would not hit the truck.

¶10 D.J. Heffner was driving the truck. He exited the truck, walked to the door of Adams' grader and said something to Adams which Adams could not hear because his grader was still running. It was Adams' practice that when someone approached his grader and wanted to talk with him, Adams exited his grader. When exiting the grader, Adams had to turn around and climb down backwards. When Adams climbed down from his grader and turned around, D.J. Heffner was standing about four inches from Adams' face. Adams felt threatened by D.J. Adams put his arms on D.J.'s shoulders and pushed D.J. back. Adams did not remember whether he pushed D.J. hard or easy. Adams next saw Gerald Heffner out of the corner of his eye about an arm's length away. He again felt threatened by the situation. D.J. began choking Adams and Adams was unable to breathe. Adams testified he was positive he never touched either of the Heffners except to push D.J. Heffner back.

¶11 The next thing Adams remembered was lying on his back and being choked. Adams also remembered being on his hands and knees, looking to his right, and seeing Bert Todd, a fellow crew member, being choked by Gerald Heffner. The next thing Adams remembered was hearing Bob Richardson, another fellow crew member, say that he ought to take Adams to the doctor. At that point, the Heffners were gone.

¶12 D.J. and Gerald Heffner were later arrested and charged with threats and improper influence in official and political matters, a violation of § 45-7-102(1)(b), MCA. A trial by jury was held March 20-21, 1997. Bert Todd (Todd), a dump truck operator, was working closely with Adams when the incident occurred. Todd

testified that he was turning his truck around about a quarter of a mile from where Adams was located when he saw Appellants' truck coming toward him going "extremely fast." Todd testified that there wasn't much room in the road for Appellants to pass, but that they "squeaked by" him heading in the direction of Adams. Todd stated that Appellants were traveling so fast he did not have time to radio Adams and warn him of their approach.

¶13 Todd completed his turnaround and headed in the direction of Adams. As he rounded a bend in the road, he saw Adams lying in the road. He also saw Gerald Heffner standing over Adams with his leg drawn back. Todd radioed the other crew members, told them of the situation, and exited his truck. Todd saw Gerald kneeling over Adams and saw Gerald strike Adams with his fist. Todd ran, tackled Gerald, and rolled him off of Adams into the ditch. Gerald got up, put Todd in a choke hold, and asked him twice if he "gives up." Todd could not answer because he couldn't breathe. After awhile, Gerald let Todd go and left with D.J. Todd testified that he never saw Adams strike, kick, or grab either Gerald or D.J. Heffner.

¶14 Bob Richardson (Richardson), a road grader operator, was also working closely with Adams on the day of the incident. Richardson testified that he saw Appellants' truck coming around Adams' grader "pretty fast" before it went into the ditch. Richardson saw D.J. get out of his truck and run to Adams' grader. Richardson continued his work thinking D.J. and Adams were simply talking. A moment later, Richardson looked up again and saw Adams lying in the ditch. Richardson then heard Todd on the radio stating that "they had Charlie [Adams] down." Richardson went to help Adams and saw Adams lying on the ground and D.J. standing over him. Richardson saw that Adams sustained severe injuries to the eye area and the chest. He looked around and saw Todd lying in the ditch with Gerald. Richardson then told Appellants that he was going to call the sheriff. At that point, Appellants jumped in their truck and left. Richardson tried to block the road with his grader but to no avail. Richardson testified he never saw Adams strike, kick, or grab either Gerald or D.J. Heffner.

¶15 Sheriff's Deputy Dave Alexander was on duty the evening of the incident. He responded to a complaint made by D.J. Heffner earlier in the day regarding an assault. Officer Alexander telephoned D.J. and asked about the nature of the assault. D.J. told Officer Alexander that Adams assaulted him and that he sustained injuries to his back. Officer Alexander instructed D.J. to write a statement and wait for him

to come and pick it up. When Officer Alexander arrived, Appellants gave him their written statements. Officer Alexander looked for visible marks or other signs of injury on Appellants but saw nothing. Appellants did not attempt to show him any injuries.

¶16 Doctor David Gorman (Dr. Gorman) specializes in family medicine and examined Adams after the incident. Adams told Dr. Gorman what had happened to him, and Dr. Gorman took photographs of Adams' injuries which were admitted into evidence. Dr. Gorman stated that the photographs showed a considerable amount of swelling over Adams' left eye and a contusion over his left cheek. Adams' left eye was completely black and blue and almost swollen shut. The photographs also showed abrasions and a large contusion on the upper right part of Adams' chest. Dr. Gorman defined an abrasion as a break of the skin and a contusion as the bruising and swelling occurring under the skin. Dr. Gorman testified that Adams suffered blunt force trauma. He stated that Adams' eye and chest injuries indicated immediate and substantial swelling, consistent with being punched or kicked. He testified that the fact that Adams bruised so quickly meant that a great amount of force was used.

¶17 Appellant Gerald Heffner testified in his own behalf and recounted a different turn of events regarding June 4, 1996. He testified that when he and D.J. came upon Bert Todd's dump truck in the center of the road, they stopped and waited for the dump truck to back up before continuing down the road. When they came upon Adams' grader, they moved to the side to avoid Adams and beeped the horn to let Adams know they were there. Gerald stated that Adams stopped the grader when its front wheel was even with the front wheel of Appellants' truck. He stated that Adams said something to them and began exiting his grader.

¶18 Meanwhile, D.J. had exited his truck. Gerald testified that Adams and D.J. met near the truck and that Adams was angry. He saw Adams strike D.J. and push him back. Gerald stated that Adams was on top of D.J. in the ditch and that Adams hit D.J. several times. Gerald did not know where any of these blows landed on D.J. Gerald ran and pulled Adams back. Gerald testified that Adams hit him and that he responded by hitting back. Gerald did not know where he hit Adams. He did not know he had given Adams a black eye until he was arrested. In his written statement made on the day of the incident, Gerald never stated that he hit Adams. Gerald testified that after the struggle with Adams, Bert Todd swung at him but missed.

Gerald threw his arm around Todd's neck and they hit the ground in the ditch. Once Todd calmed down, Gerald let him go. Gerald and D.J. then left the scene.

¶19 D.J. Heffner also testified in his own behalf. D.J.'s account of events was similar to Gerald's, only D.J. stated that when he came upon Adams' grader, he came to a full stop and did not go into the ditch. He testified that Adams continued to back up his grader and was coming close to his truck. D.J. honked his horn to alert Adams of his presence. D.J. stated he could have moved his truck out of the way. D.J. testified that he sustained injuries to his right eye and right leg. This testimony was inconsistent with his written statement made on the date of the incident. D.J. testified that Adams was conscious during the entire incident and was standing up when he and Gerald left the scene. He testified that the bruise to Adams' eye was visible when he left the scene.

¶20 When Appellants were arrested on June 6, 1996, photographs of their bodies were taken by Sheriff Joe Geldrich. It is undisputed that the pictures show light bruising on Gerald's back. However, it is disputed whether the photographs show any injuries to D.J.'s body. D.J. claimed that small red marks located under his right eye and near his right knee resulted from the struggle with Adams. The prosecutor could not see any visible injuries on D.J., let alone injuries that would have resulted from the events described by Appellants.

## DISCUSSION

*Issue 1*

¶21 Was the evidence sufficient to support Appellants' convictions for the charged offense?

¶22 This Court reviews the sufficiency of the evidence in a criminal case to determine whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. State v. Ford (1996), 278 Mont. 353, 359, 926 P.2d 245, 248.

¶23 Appellants were charged and convicted of threats and other improper influence in official and political matters, a felony, pursuant to § 45-7-102(1)(b), MCA, which provides in relevant part:

> (1) A person commits an offense under this section if the person purposely or knowingly: . . . (b) injures the person or property of a public servant . . . because of the public servant's lawful discharge of the duties of the office or to prevent the public servant from discharging the public servant's official duties.

"Public servant" means any officer or employee of government. Section 45-2-101(62), MCA.

**¶24 Appellants do not dispute that Adams is a public servant. Appellants also do not dispute that they purposely or knowingly injured Adams. Appellants only dispute the sufficiency of the evidence regarding whether they injured Adams because of Adams' lawful discharge of his duties or to prevent Adams from discharging his official duties. Appellants argue that no evidence exists to support a finding that Appellants' actions were motivated by either distaste for Adams' work or a desire to prevent Adams' from completing his work. Appellants argue the evidence shows their actions were motivated by self-defense in response to Adams pushing D.J. Appellants further argue that because Adams pushed D.J. first, the State must prove that pushing D.J. was part of Adams' official duties in order to convict them of the charged offense.**

**¶25 The State counters that proof that pushing D.J. was part of Adams' official duties is not an element of the charged offense and, therefore, need not be proven. The State further argues that Appellants have focused on a narrow time frame of the incident and have glossed over the relevant events occurring before Adams pushed D.J. The State argues that given the totality of circumstances, Appellants' arguments are without merit. We agree with the State. We will address Appellants' arguments in turn.**

**¶26 First, to obtain a conviction for a criminal offense, the State need only prove the elements of the offense as defined by statute. *See* Patterson v. New York (1977), 432 U.S. 197, 211 n.12 ("[t]he applicability of the reasonable doubt standard has always been dependent on how a state defines the offense that is charged in any given case"); State ex rel. Keyes v. Thirteenth Judicial District, 1998 MT 34, ¶¶ 15-24, 55 St. Rep. 125, 127-28, 955 P.2d 639, 642-43 (Court considered the plain language of the accountability and felony murder statutes in determining whether the defendant was charged with a legitimate offense under Montana law). A conviction pursuant to § 47-5-102(1)(b), MCA, requires proof of the following elements:**

1. That the defendant injured the person of a public servant because of the public servant's lawful discharge of the duties of the office or to prevent the public servant from discharging the public servant's official duties; and

2. That the defendant acted purposely or knowingly.

**We hold that the State was not required to prove that pushing D.J. was part of Adams' official duties because it is not an element of the charged offense.**

**¶27 Second, the State produced sufficient evidence from which a rational jury could find that Appellants' actions were motivated by either distaste for Adams' work, or a desire to prevent Adams' from completing his work, or both. Appellants saw the "men working" and "35 mph" signs posted at both ends of the construction zone, yet disregarded them and continued traveling at a high rate of speed. When Appellants came upon Adams' grader in the middle of the road, Appellants either did not stop or could not stop. Appellants were forced to move left and ended up with the their truck in the ditch.**

**¶28 D.J. got out of his truck and ran toward Adams' grader. D.J. said something to Adams. Adams couldn't hear and began to climb backwards out of his grader, as was his practice when someone wanted to talk to him. As Adams turned around, D.J. was standing four inches from his face. In response to D.J.'s invasion of Adams' personal space, Adams put his hands on D.J.'s shoulders and pushed him back. Bert Todd saw Adams lying on the ground and Gerald standing over him with his leg drawn back. Todd tackled Gerald, rolled him off of Adams, and the two landed in the ditch at which point Gerald put a choke hold on Todd and asked him whether he "gives up."**

**¶29 Bob Richardson heard Todd say over the radio, "They have Charlie [Adams] down." Richardson saw Adams lying on the ground and D.J. standing over him. He could already see that Adams had a severe eye injury. Richardson saw Todd and Gerald in the ditch and informed them that he would call the police. Appellants then got in their vehicle and left. Neither Todd nor Richardson ever saw Adams hit, kick, or fight in any way with either D.J. or Gerald. Adams came away from the incident with a swollen black eye, a contusion to his cheek, and abrasions and a contusion to his chest, whereas D.J. came away with no visible injuries, and Gerald came away with only light bruising to his lower back.**

¶30 Appellants argue that their convictions were based on mere suspicion or conjecture and, therefore, require reversal. State v. Phillips (1966), 147 Mont. 334, 340, 412 P.2d 205, 208. We do not agree. Although Appellants' convictions were based on circumstantial evidence, "we have held numerous times that circumstantial evidence is sufficient to support a conviction." State v. Miller (1988), 231 Mont. 497, 511-12, 757 P.2d 1275, 1284. Montana law permits a jury to draw inferences from the evidence presented at trial. Section 26-1-501, MCA. "'Evidence' is the means of ascertaining in a judicial proceeding the truth respecting a question of fact, including but not limited to witness testimony, writings, physical objects, or other things presented to the senses." Section 26-1-101(2), MCA. Given the evidence presented in this case, a rational jury could infer that Appellants were upset that their swift travel on the road was impeded by Adams' duties as a road grader operator, and that Appellants took their anger and frustration out on Adams.

¶31 Appellants' theory of self-defense is wholly dependent on their version of the facts, which the jury was entitled to reject. "The weight of the evidence and the credibility of the witnesses are exclusively within the province of the trier of fact; when the evidence conflicts, the trier of fact determines which shall prevail." State v. Bower (1992), 254 Mont. 1, 8, 833 P.2d 1106, 1111. It is the jury's prerogative whether to accept or reject a defendant's claim of self-defense. State v. Crazy Boy (1988), 232 Mont. 398, 401, 757 P.2d 341, 343. In this case, the jury weighed the evidence, assessed the credibility of the witnesses, and found the State's version of the incident more credible than Appellants'. Viewing the evidence in a light most favorable to the prosecution, we hold there existed sufficient evidence from which a rational jury could find that Appellants injured Adams because of the discharge of his duties or to prevent Adams from discharging his duties, and that Appellants were not justified in the use of force against Adams.

*Issue 2*

¶32 Does the record support Appellants' claims of instructional error?

¶33 Appellants' argument regarding instructional error is unclear. Appellants frame the issue in terms of whether the court erred in refusing to give an instruction on justifiable use of force. However, the substance of Appellants' argument claims that the court erred in refusing to give an instruction on assault. We dispense with this issue by first noting that the record shows that both the State and Appellants

submitted the same instruction on justifiable use of force, and that the instruction was given. Thus, it appears the first error of which Appellants speak did not occur. We also note that Appellants did not include in the record on appeal any proposed instruction on either justifiable use of force or assault. Rule 9(a), M.R.App.P. provides in relevant part:

> The original papers and exhibits filed in the district court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the district court shall constitute the record on appeal in all cases. It is the duty of a party seeking review of a judgment, order or proceeding to present the supreme court with a record sufficient to enable it to rule upon the issues raised.

Appellants having failed to make an appropriate record on appeal, we cannot consider their claims of instructional error.

*Issue 3*

¶34 Is Appellants' constitutional challenge to § 45-7-102(1)(b), MCA, properly before this Court when it was not raised below?

¶35 Appellants argue that § 45-7-102(1)(b), MCA, is unconstitutionally vague because it fails to give reasonable notice of the prohibited conduct, or is unconstitutionally overbroad because it covers protected conduct. Appellants' constitutional challenge is not reviewable because it was not raised in the District Court and may not be raised for the first time on appeal. *See* Sections 46-20-104(2) and -701(2), MCA; State v. Woods (1997), 283 Mont. 359, 372, 942 P.2d 88, 96-97. Although this Court recognizes the common law doctrine of plain error review, *see* State v. Finley (1996), 276 Mont. 126, 137, 915 P.2d 208, 215, this case does not present the "exceptional" case envisioned for plain error review. *See* State v. Sullivan (1996), 280 Mont. 25, 31, 927 P.2d 1033, 1037*;* State v. Arlington (1994), 265 Mont. 127, 152, 875 P.2d 307, 322. Thus, we decline to address Appellants' claim regarding the constitutionality of § 45-7-102(1)(b), MCA.

¶36 Affirmed.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER