DA 08-0366

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 27

STATE OF MONTANA,

       Plaintiff and Appellee,

v.

GENE RICHARD MEREDITH,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDC 2006-392
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Robin A. Meguire, Attorney at Law, Great Falls, Montana

       For Appellee:

              Hon. Steve Bullock, Montana Attorney General, Mardell Ployhar,
Assistant Attorney General, Helena, Montana

              John Parker, Cascade County Attorney, Susan Weber, Deputy County
Attorney, Great Falls, Montana

Submitted on Briefs:  June 17, 2009

Decided:  February 9, 2010

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    This is an appeal of a judgment of conviction of the District Court for the Eighth Judicial District, Cascade County, entered after a jury trial, adjudging Gene Meredith guilty of the offense of deliberate homicide, and sentencing him to life in prison without the possibility of parole. We affirm.

¶2    Meredith raises three issues on appeal which we have restated as follows:

¶3    1. Did the District Court err in denying Meredith's motion to dismiss on the basis that two hair samples were destroyed during testing?

¶4    2. Did the District Court err when it allowed the jury to hear testimony about a knife that was missing from the kitchen of Meredith's landlord after the homicide?

¶5    3. Was Meredith denied effective assistance of counsel when his counsel did not object to the admission of statements Meredith made in the police interrogation room?

**Factual and Procedural Background**

¶6    Shortly before midnight on July 29, 2006, the Great Falls Police Department received a call that the naked body of a woman had been discovered in an alley near the Leigland Apartments in downtown Great Falls. Officers responding to the call discovered that the woman, who was later identified as Rose Torres, had been stabbed numerous times and that her throat had been cut superficially.

¶7    The call reporting the discovery of Torres' body had come from Lawrence Nellons, the manager of the apartment complex. He told the officers responding to the scene that two girls had been walking through the alley when they noticed the body. The girls reported their discovery to Nellons who was the landlord of one of the girls.

2

Nellons contacted another tenant, Roger Krippner, and asked to borrow a flashlight. Nellons and Krippner then went outside together to look for the body. They discovered it in the alley next to a dumpster.

¶8    Nellons and Krippner later testified that while they were in the alley waiting for the police, they observed a blue van with white doors driving through the alley with its lights off.  The van stopped and the male driver repeatedly asked the two men if they had seen his dog.  The driver then exited the van and, instead of walking toward Nellons and Krippner, he walked towards Torres' body and the dumpster where a plastic bag with blood on it was later found.  When Nellons and Krippner told the driver that he should not touch the dumpster, the driver replied that he had already touched it.  Nellons and Krippner also told the driver that he should not leave because it was a crime scene, but the driver got back in the van and drove away.  Thinking that the driver's actions were suspicious, Nellons and Krippner gave officers a physical description of the van and its driver.  Krippner identified Meredith from a photo lineup as the driver of the van.

¶9    On July 30, 2006, the police received information that Meredith owned a 1986 Aerostar van similar to the one described by Nellons and Krippner.  The police also learned that Meredith was renting a room from Helen Halco.  Unable to locate Meredith at Halco's, two officers went to the residence of Meredith's girlfriend, Debra Bailey.  Once there, the officers observed Meredith's van parked in the driveway.

¶10    The officers later testified that when they knocked on Bailey's door, she immediately came outside.  She was shaking and appeared to be in shock.  She told the officers, "Oh, thank God you're here.  Don't lie to me, tell me the truth, did somebody

get stabbed last night?  Did a lady get killed?"  When the officers asked her why she would say that, she explained that Meredith was inside her home and that he had just told her that he had killed someone the previous night.  While the officers were talking to Bailey, Meredith came outside and sat down on the porch to smoke a cigarette.  The officers took Meredith into custody.

¶11    At the police station, Meredith was placed in an interrogation room.  While sitting alone in the room prior to being interviewed, Meredith stated, "They got me.  By what I said to Debby, they got me.  How did they find my van so quickly?"

¶12    During the subsequent interview by Detective McDermott, Meredith admitted that he had met Torres on the night in question and that he had walked with her to a local bar while pushing his bicycle, but he denied having anything to do with her death.  Meredith also admitted that he and Torres had argued, but he claimed that they had parted ways after they left the bar.  According to Meredith, he went home, but later left his house and walked over to Bailey's to get his van so that he could drive to the store to get more beer. He claimed that he was driving down the alley to avoid police because the registration on his vehicle had expired and because he was intoxicated.  He stated that he saw two men in the alley with a flashlight.  He also stated that he did go over to the dumpster and move a bag with blood on it, but he did not have any explanation for why he did so.

¶13    Prior to this interview, information that the murder weapon had not been found had not been released to the media.  Nevertheless, during the interview, Meredith told the officers, "You don't have no murder weapon.  You don't have nothing."

¶14 At some point during this interview, Detective McDermott noticed stains on the sandals Meredith was wearing, so McDermott had Meredith remove them for testing. After Detective McDermott left to place the sandals into evidence, Meredith, who once again was alone in the room, stated, "Yeah, you know what? They might find blood on those. I should have gotten rid of them. That's the second mistake I made."

¶15 In a search of Meredith's residence, officers located a shirt with possible blood stains. Officers also located spots they believed to be blood on a door lock, a washing machine, and Meredith's bicycle. The plastic bag with blood on it was also retrieved from the dumpster near Torres' body. All of these items, including Meredith's sandals, were tested by the Montana State Crime Lab. The testing revealed that the spots on the bike, door lock and washing machine were not blood. However, the testing also revealed that the spots on the shirt, sandals and plastic bag were blood and that the blood was consistent with Torres' DNA profile.

¶16 Meredith was charged with deliberate homicide in violation of § 45-5-102, MCA. After Meredith's arrest, Dr. Viginia Hill, a psychiatrist at the Montana State Hospital, evaluated Meredith. Dr. Hill diagnosed Meredith with schizoaffective disorder. However, Dr. Hill explained at trial that a person with schizoaffective disorder can knowingly and purposely commit homicide.

¶17 Although Dr. Hill concluded that Meredith did have a serious mental illness, she also observed that he had a tendency to over report his symptoms. Meredith claimed to have an alternate personality, yet Dr. Hill noted that Meredith did not have a history of experiencing an alternate personality and that it was "highly unlikely" that he had

suddenly developed one at the same time he was being investigated for homicide. Dr. Hill testified that Meredith appeared to get the idea of an alternate personality from the officers who had interviewed him.

¶18 Trial was held April 28, 2008, through May 2, 2008. The jury returned a verdict of guilty and Meredith was subsequently sentenced to life in prison without the possibility of parole. Meredith now appeals from his conviction. Additional facts will be included where necessary.

**Issue 1.**

¶19 *Did the District Court err in denying Meredith's motion to dismiss on the basis that two hair samples were destroyed during testing?*

¶20 Two hairs were discovered on Torres' naked body, one on her left thigh and one in her right hand. Both hairs were sent to the FBI lab for mitochondrial DNA analysis in May 2007. In a report dated March 28, 2008, the FBI lab indicated that while Torres could not be excluded as the source of the hair located in her hand, Meredith was not the source of that hair. The report also indicated that the hair on Torres' thigh had insufficient DNA for testing. Both hairs were completely consumed during the testing process.

¶21 On April 18, 2008, Meredith's trial counsel filed a combined motion seeking a dismissal on the basis that the State destroyed crucial evidence and seeking a continuance because of the State's dilatory disclosure of the FBI report. A hearing on Meredith's motion was held on April 22, 2008, at the conclusion of which the court denied the

6

motion on the grounds that Meredith had not established the materiality of the evidence or any bad faith on the part of the State.

¶22 On appeal, Meredith contends that his right to a fair trial was prejudiced when the District Court failed to grant his motion to dismiss because the State destroyed potentially exculpatory evidence before the defense had an opportunity to test it. Meredith maintains that, even if there was not a sufficient amount of hair for both the State and defense to test, the District Court could have: (a) permitted a defense expert to examine the hairs prior to any mitochondrial DNA testing in order to perform a microscopic analysis of the hair; (b) ordered an independent lab to perform the mitochondrial DNA testing; or (c) permitted the defense to have its own expert observe the testing process. Meredith argues that the State's failure to notify Meredith of its intent to destroy the hair evidence, whether purposeful or not, precluded any of these things from taking place.

¶23 The State contends, on the other hand, that the hairs were not exculpatory, thus Meredith's due process rights were not violated. The State also contends that in the nine months that the hairs were in the State's possession, Meredith never filed a motion to allow his own experts to test them.

¶24 This Court reviews the denial of a motion to dismiss in a criminal case de novo to determine whether the district court's conclusions of law are correct. *State v. Samples*, 2008 MT 416, ¶ 13, 347 Mont. 292, 198 P.3d 803; *State v. Howard*, 2008 MT 173, ¶ 8, 343 Mont. 378, 184 P.3d 344.

¶25 A criminal defendant has a constitutional right to obtain exculpatory evidence and a denial of this right is a violation of due process. *State v. Belgarde*, 1998 MT 152, ¶ 16,

289 Mont. 287, 962 P.2d 571 (citing *State v. Sadowski*, 247 Mont. 63, 79, 805 P.2d 537, 546 (1991) *overruled on other grounds by State v. Ayers*, 2003 MT 114, 315 Mont. 395, 68 P.3d 768).  "Exculpatory evidence is evidence that '[w]ould have tended to clear the accused of guilt, to vitiate a conviction.' "  *State v. Duncan*, 2008 MT 148, ¶ 17, 343 Mont. 220, 183 P.3d 111 (quoting *Belgarde*, ¶ 16).  To prevail on a due process claim, a defendant must prove that the State negligently suppressed evidence that was exculpatory and, therefore, vital to the defense. *Duncan*, ¶ 17.

¶26   In addition, this Court has previously determined that

> when the State, due to negligence, loss, replacement or destruction, is unable to produce certain physical evidence in the prosecution of the case, reversal of a conviction is not necessary where the actual objects were not vital to the defense, were not exculpatory in nature, and the result would not have been affected by their introduction.

*State v. Halter*, 238 Mont. 408, 412, 777 P.2d 1313, 1316 (1989) (citing *State v. Craig*, 169 Mont. 150, 545 P.2d 649 (1976)).  Furthermore, the exculpatory nature of the evidence must have been apparent before the evidence was destroyed.  *Halter*, 238 Mont. at 412, 777 P.2d at 1316.

¶27   In *Halter*, this Court held that the district court had correctly granted the defendant's motion to dismiss because the bull that the defendant had allegedly stolen and illegally branded had been destroyed.  *Id.*  Without the bull's hide, the defendant was unable to develop evidence indicating that he had not illegally branded the bull.  *Id.* *Halter* is distinguishable from the instant case, however, because the evidence destroyed in *Halter* was critical to the defendant's defense, whereas the hairs that were destroyed in this case were not.

¶28    Contrary to Meredith's contention that "there can be no question" that the hairs had exculpatory value to him, Meredith failed to show that they were, in fact, exculpatory.   In his brief on appeal, Meredith claimed that "at least one of the hair samples could not be said to belong to either the victim or Meredith" raising the possibility that someone else committed the crime.  However, that is not what the FBI lab report indicated.  Rather, it indicated that there was not enough DNA on one of the hairs for testing and that, because the DNA sequences for the other hair and the blood sample taken from Torres were the same, Torres could not be excluded as the source of that hair.

¶29    Neither hair sample contained a root or any other source of nuclear DNA, thus, according to the forensic experts, the only test that could be performed on the hair samples was a mitochondrial DNA test.   Alice Ammens with the State Crime Lab testified that she could not conclude from the FBI lab report of the mitochondrial DNA testing of the hairs whether they belonged to Torres or Meredith, she could only testify whether they were similar.   She further testified:   "That's all you can say with mitochondrial hair comparisons."   In other words, mitochondrial DNA testing cannot prove that a person is the source of the hair, it can only exclude an individual as the source.

¶30    We also disagree with Meredith's contention that the exculpatory value of the evidence was apparent at the outset.  Meredith claimed that "if defense testing of the hair identified another donor, this evidence would have been vital to Meredith's defense and would have likely changed the outcome of the trial."  Meredith also claimed that the hairs

could provide evidence that someone else had close contact with Torres "at the time of the crime."

¶31    Even assuming that both hairs would have tested negative for both Meredith's and Torres' DNA, this evidence would not have exonerated Meredith. First, the hairs could have come from any number of sources either before or after Torres was killed as her body was found naked in an alley by a dumpster. Second, there is no way to know when the hairs were deposited on Torres' body since several people had been near the body prior to the arrival of law enforcement officers.

¶32    Moreover, there was sufficient other evidence linking Meredith to the crime, including the blood stains on Meredith's shirt and sandals that tested positive for Torres' DNA, along with Meredith's incriminating statements to his girlfriend and others. Since the hair evidence had no potential to clear Meredith of guilt, we conclude that Meredith was not deprived of due process by the destruction of the hairs.

¶33    We also determine here that the destruction of the hair samples was not the intentional or deliberate purpose of the State, nor was the State negligent in preserving necessary evidence in this case. At the April 22, 2008 hearing on Meredith's Motion to Dismiss, Detective McDermott testified that Meredith was sent a letter in August 2007 that the hairs were being sent to the FBI lab for testing. Moreover, the State Crime Lab held the hairs for over nine months before they were sent to the FBI lab for testing, and the FBI lab held the hairs for another nine months before testing. In all that time, Meredith never filed a motion to preserve the hairs or to allow his own experts to test

them. Consequently, Meredith's own lack of due diligence contributed to the prejudice he claims he suffered.

¶34 Accordingly, we hold that the District Court did not err in denying Meredith's motion to dismiss.

**Issue 2.**

¶35 *Did the District Court err when it allowed the jury to hear testimony about a knife that was missing from the kitchen of Meredith's landlord after the homicide?*

¶36 During the investigation, law enforcement officers spoke with several witnesses. One of those witnesses was Mark Halco, the son of Meredith's landlord. He informed the officers that a knife had been missing from his mother's kitchen since the time of the homicide. Prior to trial, Meredith filed a motion in limine seeking to exclude any evidence about any specific knife because the State had not located the knife that was used in the homicide. The District Court denied the motion.

¶37 In his opening statement at trial, the prosecutor pointed out that Halco would testify regarding the missing knife. Meredith objected arguing that evidence about the knife was inadmissible because the prejudice outweighed the probative value. According to Meredith, evidence concerning the missing knife had no probative value because the State could not prove that it was the weapon used in the crime. The court overruled Meredith's objection.

¶38 During trial, Halco testified that he was at his mother's home a couple days after the homicide and he noticed that a large knife was missing from her kitchen. He stated that he noticed the absence of the knife because his mother frequently used that knife, it

11

normally was stored in a knife holder on the counter, and it had not been seen since the homicide. Halco further testified that the knife was approximately twelve inches long and had an eight-inch blade.

¶39 Meredith objected to this testimony on the grounds that there was no showing when the knife Halco referred to disappeared. The court overruled Meredith's objection noting that counsel could cross examine on that point.

¶40 The State's next witness, Dr. Kemp, the forensic pathologist who performed the autopsy on Torres' body, presented testimony about Torres' wounds. Dr. Kemp testified that Torres had four stab wounds in addition to the cut across her neck, and that the maximum depth of the stab wounds was seven inches.

¶41 On appeal, Meredith asserts that there was no evidence connecting the missing knife to the object that killed Torres. Consequently, Meredith argues that the District Court should not have permitted evidence of the missing knife to be heard by the jury as it was irrelevant, misleading and extremely prejudicial.

¶42 A district court's ruling on a motion in limine is an evidentiary ruling and is, therefore, reviewed for an abuse of discretion. *State v. Snell*, 2004 MT 334, ¶ 17, 324 Mont. 173, 103 P.3d 503. We have previously stated that

> [t]he purpose of a motion in limine is to prevent the introduction of evidence which is irrelevant, immaterial, or unfairly prejudicial. Accordingly, the authority to grant or deny a motion in limine rests in the inherent power of the court to admit or exclude evidence and to take such precautions as are necessary to afford a fair trial for all parties.

12

*State v. Krause*, 2002 MT 63, ¶ 32, 309 Mont. 174, 44 P.3d 493 (internal quotation marks omitted) (citing *Hulse v. State, Dept. of Justice*, 1998 MT 108, ¶ 15, 289 Mont. 1, 961 P.2d 75; *City of Helena v. Lewis*, 260 Mont. 421, 425-26, 860 P.2d 698, 700 (1993)).

¶43 Moreover, a district court has broad discretion to determine whether evidence is relevant and admissible, and we will not overturn a lower court's evidentiary ruling unless the court abused its discretion. *State v. Damon*, 2005 MT 218, ¶ 12, 328 Mont. 276, 119 P.3d 1194; *State v. MacKinnon*, 1998 MT 78, ¶ 12, 288 Mont. 329, 957 P.2d 23. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401; *State v. Dunning*, 2008 MT 427, ¶ 24, 347 Mont. 443, 198 P.3d 828. Evidence that is relevant may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. M. R. Evid. 403; *Dunning*, ¶ 24.

¶44 Here, we conclude that Halco's testimony regarding the missing knife was relevant because the jury could logically infer that the missing knife was used to kill Torres. Dr. Kemp's testimony showed that Torres' wounds were created with a knife having a blade at least seven inches long. Halco's testimony established that Meredith had access to such a knife.

¶45 We also hold that the evidence regarding the missing knife was not unfairly prejudicial to Meredith. Evidence is unfairly prejudicial when it " 'arouses the jury's hostility or sympathy for one side without regard to its probative value.' " *State v. Schauf*, 2009 MT 281, ¶ 41, 352 Mont. 186, 216 P.3d 740 (quoting *State v. Bieber*, 2007

MT 262, ¶ 59, 339 Mont. 309, 170 P.3d 444). Moreover, "Montana law clearly permits a jury to draw inferences from circumstantial evidence presented at trial." *State v. Landis*, 2002 MT 45, ¶ 32, 308 Mont. 354, 43 P.3d 298 (citing *State v. Heffner*, 1998 MT 181, ¶ 30, 290 Mont. 114, 964 P.2d 736). Circumstantial evidence is evidence "which tends to establish a fact by proving another and which, though true, does not of itself conclusively establish that fact but affords an inference or presumption of its existence. Section 26-1-102(1), MCA. And, an inference is "a deduction which the trier of fact may make from the evidence." Section 26-1-501, MCA

¶46 In this case, we conclude that the District Court properly exercised its discretion in balancing the probative value of the testimony regarding the missing knife against any prejudicial effect that testimony may have. Clearly the jury could properly infer, without arousing any "hostility" towards Meredith or unfairly prejudicing him, that the knife missing from Meredith's landlord's kitchen was the knife used to kill Torres.

¶47 Accordingly, we hold that the District Court did not err in allowing the jury to hear testimony regarding the missing knife.

## Issue 3.

¶48 *Was Meredith denied effective assistance of counsel when his counsel did not object to the admission of statements Meredith made in the police interrogation room?*

¶49 Meredith argues that his right to a fair trial was prejudiced by his trial counsel's failure to move to suppress the incriminating statements he made to himself while alone in the interrogation room or to object to the admission of those statements at trial.

14

¶50 The right to effective assistance of counsel is a fundamental right protected by the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution. A criminal defendant is denied effective assistance of counsel if: (1) counsel's conduct falls short of the range reasonably demanded in light of the Sixth Amendment; and (2) counsel's failure is prejudicial. *State v. Rose*, 1998 MT 342, ¶ 12, 292 Mont. 350, 972 P.2d 321; *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

¶51 Claims of ineffective assistance of counsel raise mixed questions of law and fact which this Court reviews de novo. *State v. Herman*, 2008 MT 187, ¶ 10, 343 Mont. 494, 188 P.3d 978; *Whitlow v. State*, 2008 MT 140, ¶ 9, 343 Mont. 90, 183 P.3d 861. A defendant may raise only record-based ineffective assistance of counsel claims on direct appeal. *State v. Earl*, 2003 MT 158, ¶ 39, 316 Mont. 263, 71 P.3d 1201. We distinguish record-based from non-record-based claims based on whether the record fully explains why counsel took, or failed to take, a particular course of action. *State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, 30 P.3d 340. If the allegation cannot be documented from the record, the claimant must raise the ineffective assistance of counsel claim in a petition for postconviction relief. *Earl*, ¶ 39. A claim of ineffective assistance of counsel predicated upon trial counsel's failure to object to matters during trial can be decided on the basis of the record, thus such claims should be raised on direct appeal. *Petition of Hans*, 1998 MT 7, ¶ 42, 288 Mont. 168, 958 P.2d 1175.

¶52 In the instant case, because Meredith's ineffective assistance of counsel claim is based on counsel's failure to object to the admission at trial of the incriminating

15

statements Meredith made to himself in the police interrogation room, we conclude that his claim is record based and is, therefore, correctly before us in this direct appeal.

¶53 Meredith asserts on appeal that his right to privacy was violated by the State's unreasonable search in the form of recording his statements without his knowledge while he was in the police interrogation room. Meredith analyzes his situation to our decision in *State v. Goetz*, 2008 MT 296, ¶ 54, 345 Mont. 421, 191 P.3d 489, wherein we held that the warrantless electronic monitoring and recording of face-to-face conversations with the consent of one of the participants violates the other participants' right to privacy and to be free from unreasonable searches and seizures guaranteed by Article II, Sections 10 and 11 of the Montana Constitution.

¶54 *Goetz* involved two appeals with slightly different facts. However, because the primary legal issue raised in the appeals was identical, we consolidated the cases for purposes of oral argument and resolution. *Goetz*, ¶ 4. Each of the cases involved a confidential informant who was fitted with a body wire receiving device and provided with money to purchase drugs from the defendants. In one case, the drug buy was conducted in the defendant's residence. In the other case, the first drug buy was conducted in the confidential informant's vehicle and the second drug buy was conducted in the defendant's residence. Each transaction was electronically monitored and recorded by law enforcement officers via the confidential informant's body wire. Neither defendant was aware of, nor did they consent to, the electronic monitoring and recording of their conversations. *Goetz*, ¶¶ 5, 7.

16

¶55 In reaching our decision in *Goetz*, we analyzed Montana's existing constitutional search and seizure, and right to privacy jurisprudence. We pointed out that the initial inquiry in addressing questions involving warrantless electronic monitoring and recording is determining whether such conduct constitutes a search. *Goetz*, ¶ 25 (citing *State v. Scheetz*, 286 Mont. 41, 46, 950 P.2d 722, 724 (1997)). To that end, we stated in *Goetz* that a search is " 'the use of some means of gathering evidence which infringes upon a person's reasonable expectation of privacy.' " *Goetz*, ¶ 25 (quoting *State v. Hardaway*, 2001 MT 252, ¶ 16, 307 Mont. 139, 36 P.3d 900). We further stated that "[a] search occurs when the government infringes upon an individual's expectation of privacy that society considers objectively reasonable." *Goetz*, ¶ 25. Where no objectively reasonable expectation of privacy exists, a "search" does not occur within the contemplation of Article II, Section 11. *Goetz*, ¶ 25 (citing *State v. Hamilton*, 2003 MT 71, ¶ 17, 314 Mont. 507, 67 P.3d 871).

¶56 Unlike *Goetz*, we conclude in the case *sub judice*, that while Meredith *may* have an expectation of privacy in his statements, it is not one that society would recognize as objectively reasonable. Meredith was in a police interrogation room when he made the incriminating statements. Police interrogation rooms are traditionally areas where people are watched and monitored in some form or fashion whether it be by two-way glass, video taping or audio recording. In addition, there was no reason for Meredith to make the incriminating statements out loud unless he wanted to be overheard. Had he wanted to preserve his privacy, he would not have voiced his thoughts.

¶57 Because we conclude that no objectively reasonable expectation of privacy existed in this case, we further conclude that a search within the contemplation of Article II, Section 11, did not occur here. *See Goetz*, ¶ 25. Consequently, counsel's failure to object did not render counsel's performance deficient and did not fall short of the range reasonably demanded by the Sixth Amendment. *See Rose*, ¶ 12.

¶58 Nevertheless, even if we concluded that counsel's performance in this case was deficient, Meredith has not demonstrated a reasonable probability that but for that deficient performance, the result of the proceeding would have been different. *See Rose*, ¶ 19. Other evidence admitted at trial established that Meredith was with Torres less than one hour before her death; Meredith was observed at the scene of the homicide later that evening; Meredith had Torres' blood on his shirt and sandals; and Meredith admitted to his girlfriend the day after the homicide that he had stabbed a woman the night before.

¶59 Accordingly, we hold that Meredith was not denied effective assistance of counsel by counsel's failure to object to the admission of Meredith's incriminating statements.

¶60 Affirmed.

/S/ JAMES C. NELSON

We concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE